No. 15-1908

# United States Court of Appeals
## for the First Circuit

———————————

MASSACHUSETTS DELIVERY ASSOCIATION,
*Plaintiff-Appellee*,

*v.*

MAURA HEALEY,
IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE
COMMONWEALTH OF MASSACHUSETTS,

*Defendant-Appellant.*

———————————

APPEAL FROM A JUDGMENT OF THE DISTRICT COURT

———————————

## BRIEF OF DEFENDANT-APPELLANT

———————————

MAURA HEALEY
*Attorney General*
*of Massachusetts*

Douglas S. Martland, 1st Cir. No. 1137738
*Assistant Attorney General*
Government Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2062
email: douglas.martland@state.ma.us

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF THE ISSUE..............................................................1

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE CASE................................................................2

      1.      Nature of the Claim................................................................2

      2.      Procedural History ................................................................2

      3.      Summary Judgment Record ........................................................4

      4.      The District Court Finds Prong 2 FAAAA-Preempted ..............6

STANDARD OF REVIEW ....................................................................8

SUMMARY OF ARGUMENT ..............................................................8

ARGUMENT .........................................................................................12

    I.     A Ruling in MDA's Favor Would Require Expanding the
           Reach of FAAAA Preemption Beyond the Limits Recognized
           by the Supreme Court and Other Circuits, and Contrary to the
           Presumption Against Preemption......................................................12

          A.     The FAAAA's Legislative History Makes Clear
                  Congress Intended to Preempt State Economic
                  Regulation of Motor Carriers, But Not All Laws that
                  Might Impose Economic Effects on Them. ...........................13

          B.     Neither the Supreme Court Nor this Court Has Addressed
                  When a State Law's Indirect Economic Effects Can Lead
                  to ADA or FAAAA Preemption. ...........................................18

          C.     The Supreme Court's ERISA Cases Show that a State
                  Law's Indirect Economic Effects Can Also Lead to
                  "Relate To" Preemption, But Only Where the Effects are
                  So Acute as to Effectively Mandate (or Prohibit) a
                  Particular Price, Route, or Service..........................................23

D. Circuit Courts Addressing State Laws that Impose Indirect Economic Effects on a Carrier Through Increased Labor Costs Have Yet to Find the Effects Sufficient to Trigger FAAAA or ADA Preemption. ...............28

E. The Presumption Against Preemption of State Labor Laws Weighs Against Finding FAAAA Preemption Here. .......................................................................................29

1. The Presumption Protects States and Their Citizens Against Inadvertent Surrender of Traditional State Powers Like the Regulation of Employment...................................................................30

2. The Presumption Applies in FAAAA Cases. ................32

II. The FAAAA Does Not Preempt Prong 2 as Matter of Law Based Solely on its Logical Effects and Without Consideration of the Evidence. .......................................................................35

III. Because MDA Cannot Show that Either Section 148B or Any of the Wage-and-Hour Laws It Triggers Has a "Significant Impact" on Xpressman's Prices, Routes, or Services, the Attorney General, Not MDA, Was Entitled to Summary Judgment. ..........................................................................40

A. MDA Did Not and Cannot Establish that Prong 2's Indirect Effects Amount to a "Significant Impact" on Xpressman's Prices. ................................................40

1. Section 148B Triggers Only M.G.L. Chapters 149 and 151, Not Every Conceivable Federal and State Employment Statute. ....................................................41

2. Section 148B Does Not Request Motor Carriers to Comply with "Industry Standards" ................................44

3. The District Court Overstated the Impact of Obligations Triggered by Section 148B. ........................45

4.    MDA Cannot Establish an Impact on Xpressman's Prices Based on the Other Statutes It Cited Below. .......48

B.    MDA Did Not and Cannot Establish that Prong 2's Indirect Effects Amount to a "Significant Impact" on Xpressman's Routes..................................................................50

C.    MDA Did Not and Cannot Establish that Prong 2's Indirect Effects Amount to a "Significant Impact" on Xpressman's Services. ...........................................................53

D.    Even if MDA Had Shown that Any Specific Law Has a Significant Impact on Xpressman's Prices, Routes, or Services, at Most MDA Would be Entitled to a Ruling that the Specific Law is Triggered by Prong 2, is Preempted....................................................................................55

IV.    The District Court Erred in Granting MDA Summary Judgment. ...............................................................................55

A.    The District Court's Consideration of Disputed Facts. ............56

B.    The District Court's Improper Inferences.................................57

CONCLUSION .........................................................................................58

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Abdu-Brisson v. Delta Air Lines, Inc.,*
128 F.3d 77 (2nd Cir. 1997)................................................... 26-27

*Altria Group v. Good,*
555 U.S. 70 (2008).................................................................. 34

*American Airlines, Inc. v. Wolens,*
513 U.S. 219 (1995)................................................... 20, 33, 44

*American Trucking Ass'ns, Inc. v. City of Los Angeles,*
133 S. Ct. 2096 (2013)..................................................... 21, 39

*American Trucking Ass'ns, Inc. v. City of Los Angeles,*
559 F.3d 1046 (9th Cir. 2009) .......................................... 38, 39

*American Trucking Ass'ns, Inc. v. City of Los Angeles,*
660 F.3d 384 (9th Cir. 2011) .................................................. 39

*American Trucking Ass'ns, Inc. v. City of Los Angeles,*
577 F. Supp. 2d 1110 (C.D. Cal. 2008)............................ 38, 39

*Amerijet Int'l , Inc. v. Miami-Dade Cty.,*
___ Fed. Appx. ___, 2015 WL 5515343
(11th Cir. 2015).................................................... 27, 29, 46, 47

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)................................................................. 8

*Athol Daily News v. Bd. of Review of Div. of Emp't*
*& Training*, 439 Mass. 171,
786 N.E.2d 365 (2003)  ........................................................ 42

iv

*Boston Bicycle Couriers, Inc. v. Deputy Dir. of the Div. of*
    *Employment & Training*,
    56 Mass. App. Ct. 473, 778 N.E.2d
    964 (2002)............................................................ 42-43

*Bower v. EgyptAir Airlines Co.,*
    731 F.3d 85 (1st Cir. 2013)....................................... 8, 22, 57, 58

*Branche v. Airtran Airways, Inc.,*
    342 F.3d 1248 (11th Cir. 2003) ................................. 35

*Brown v. United Airlines*,
    720 F.3d 60 (1st Cir. 2013)....................................... 32

*Buck v. American Airlines,*
    476 F.3d 29 (1st Cir. 2007)....................................... 32

*Cal. Div. of Labor Standards Enf. v. Dillingham Construction*,
    519 U.S. 316 (1997)................................................... 25, 34, 47

*Californians for Safe and Competitive Dump*
    *Truck Transp. v. Mendonca*,
    152 F.3d 1184 (9th Cir. 1998) ................... 25, 27, 28, 29, 46, 47

*Calop Bus. Sys., Inc. v. City of Los Angeles*,
    614 Fed. Appx. 867 (9th Cir. 2015)........................... 46

*Comey v. Hill,*
    387 Mass. 11,
    438 N.E.2d 811 (1982) ............................................. 48

*Costello v. Beavex, Inc.,*
    7th Circuit No. 15-1109, 15-1110
    (Argued September 18 2015) ................................... 1

*Central Transport, Inc. v. Public Service Commission*,
    566 N.W.2d 299 (Mich. Ct. App. 1997)................... 38

*Columbus v. Ours Garage & Wrecker Serv.*,
    536 U.S. 424 (2002)........................................................... 30, 35

*Combined Mgt. v. Superintendent of Bur. Of Ins.*,
    22 F.3d 1 (1st Cir. 1994).......................................................... 45

*Dan's City Used Cars, Inc. v. Pelkey,*
    133 S. Ct. 1769 (2013)..................................... 12, 16, 27, 30, 42

*De Buono v. NYSA-ILA Medical & Clinical Services Fund*,
    520 U.S. 806 (1997)..................................................... 25, 26, 34

*DiFiore v. American Airlines, Inc.*,
    646 F.3d 81 (1st Cir. 2011)...................................................*passim*

*Dilts v. Penske Logistics, LLC*,
    769 F.3d 637 (9th Cir. 2014) ..................... 27, 28, 29, 46, 51, 52

*Filo Foods, LLC v. City of SeaTac,*
    357 P.3d 1040 (Wash. 2015) .................................................. 46

*Fort Halifax Packing Co. v. Coyne*,
    482 U.S. 1 (1987)..................................................................... 31

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
    528 U.S. 167 (2000)................................................................ 37

*Gennell v. Fedex Ground Package System, Inc.*,
    2013 WL 4854362 (D. N.H. 2013) ........................................ 42

*Hattem v. Schwarzenegger,*
    449 F.3d 423 (2nd Cir. 2006).................................................. 25

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    582 F.3d 156 (1st Cir. 2009)................................................... 32

*Jones v. Rath Packing Co.,*
    430 U.S. 159 (1977)................................................................ 30

*MDA v. Coakley,*
    769 F.3d 11 (1st Cir. 2014)............... 2, 3, 4, 8, 11, 12, 29, 37, 43

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996)........................................................ 30, 34

*Morales v. Trans World Airlines*,
    504 U.S. 374 (1992)............................ 18, 19, 22, 26, 27, 31, 33

*N.H. Motor Transp. Ass'n v. Rowe,*
    448 F.2d 66 (1st Cir. 2006)................................. 9, 26, 34, 35, 54

*N.Y. State Conference of Blue Cross & Blue Shield Plans*
    *v. Travelers Ins. Co.*,
    514 U.S. 645 (1995)............................ 24, 26, 27, 30, 34, 46, 47

*Northwest, Inc. v. Ginsburg*,
    134 S. Ct. 1422 (2014)............................................................ 21

*Overka v. American Airlines, Inc.,*
    790 F.3d 36 (1st Cir. 2015)................................................ 22, 44

*People v. PAC Anchor Transp., Inc.,*
    329 P.3d 180 (Cal. 2014).................................................... 37, 46

*Remington v. J.B. Hunt Trans., Inc.,*
    First Circuit No. 15-1252 (Argued November 2, 2015)............ 1

*R.I. Hospitality Ass'n v. City of Providence ex rel. Lombardi*,
    667 F.3d 17 (1st Cir. 2011)....................................................... 31

*Rockwood v. SKF USA, Inc.,*
    687 F.3d 1 (1st Cir. 2012)....................................................... 56

*Rowe v. New Hampshire Motor Transp. Ass'n*,
    552 U.S. 364 (2008)...................... 12, 13, 16, 20, 22, 33, 47, 54

*Schwann v. FedEx Ground Package System, Inc.,*
    First Circuit No. 15-1214 (Argued November 2, 2015)............ 1

*S.C. Johnson & Son, Inc. v. Trans. Corp. of Am., Inc.,*
    697 F.3d 544 (7th Cir. 2012) .................................. 28, 29, 46, 47

*Sebago v. Boston Cab Dispatch, Inc.*,
    471 Mass. 321, 28 N.E.3d
    1139 (2015) ...................................................................... 42, 43

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983) ................................................ 19, 20, 23, 27

*Sossamon v. Texas,*
    131 S Ct. 1651 (2011) ............................................................. 30

*Tobin v. Federal Exp. Corp.,*
    775 F.3d 448 (1st Cir. 2014).................................... 8, 22, 32, 35

*United Parcel Service, Inc., v. Flores-Garcia*
    318 F.3d 323 (1st Cir. 2003)................................................... 32

*United States v. Bass,*
    404 U.S. 336 (1971) ................................................................. 31

*Will v. Michigan Dept. of State Police*,
    491 U.S. 58 (1989) .................................................................. 31

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ....................................... 29, 32, 33, 34, 35

## <u>Statutes</u>

Airline Deregulation Act of 1978,
    Pub. L. No. 95-504, 92 Stat. 1706 .................................... *passim*

Employee Retirement Income Security Act of 1974 (ERISA)
    Pub. L. 93–406, 88 Stat. 829 ........................................... *passim*

Family Medical Leave Act of 1993,
    Pub. L. 103-3, 107 Stat. 6 ....................................................... 49

Federal Aviation Administration Authorization Act of 1994,
  Pub. L. No. 103-305, 108 Stat. 1569 ................................. *passim*

Illinois Wage Payment and Collection Act
  820 ILCS 115 ........................................................................ 1

Motor Carrier Act of 1980,
  Pub. L. No. 96-296, 94 Stat. 793 ............................................. 13

National Labor Relations Act of 1935
  Pub. L. No. 74-198, 49 Stat. 449 ............................................. 16

Patient Protection and Affordable Care Act,
  Pub. L. No. 111-148, 124 Stat. 119 – 1025 (2010) ................. 41

Railway Labor Act of 1926
  44 Stat. 577 ............................................................................. 16

26 U.S.C. § 401(k) ...................................................................... 44

26 U.S.C. § 3121(d)(2) ................................................................ 41

26 U.S.C. § 3306(i) ..................................................................... 41

26 U.S.C. § 4980H(c)(4)(a) ........................................................ 41

28 U.S.C. § 1291 ......................................................................... 1

49 U.S.C. § 14501(c)(1) ......................................................... 1, 9, 11

49 U.S.C. § 41713 ....................................................................... 11

49 U.S.C. § 41713(b)(1) .............................................................. 13

Alaska Stat. § 23.10.065 .............................................................. 15

Alaska Stat. § 23.10.145 .............................................................. 15

ix

Del. Code Ann. tit. 19, §§ 901-902 ................................................... 15

D.C. Code § 36-220 ....................................................................... 15

D.C. Code § 36-220.2 ..................................................................... 15

Md. Code Ann., Lab. & Empl. § 3-401 ............................................ 15

Md. Code Ann., Lab. & Empl. § 3-413 ............................................ 15

Me. Rev. Stat. tit. 26, §§ 663-664 .................................................. 15

M.G.L. c. 62B .......................................................................... 6, 43

M.G.L. c. 149 .................................... 1, 2, 7, 10, 30, 35, 36, 41, 43, 55

M.G.L. c. 149, § 47 ............................................................... 6, 50, 52

M.G.L. c. 149, § 52D(a) ................................................................. 49

M.G.L. c. 149, § 100 ................................................................. 6, 50

M.G.L. c. 149, § 105D ................................................................... 49

M.G.L. c. 149, § 148B .............................................................*passim*

M.G.L. c. 149 § 148B(a)(2) ............................................................. 2

M.G.L. c. 149, § 148B(d).............................................................. 43

M.G.L. c. 149, § 188 (repealed eff. Jul. 1, 2013) ............................. 49

M.G.L. c. 151 .................................... 1, 2, 7, 10, 30, 35, 36, 41, 43, 55

M.G.L. c. 151, § 1 ....................................................................... 46

M.G.L. c. 151, § 1A ................................................................. 6, 45

M.G.L. c. 151, § 15 ............................................................. 6, 48, 57

x

M.G.L. c. 151A, § 2 ........................................................ 48

M.G.L. c. 151B ............................................................. 48

M.G.L. c. 151B, § 4(9½) ................................................ 48

M.G.L. c. 152 ........................................................... 6, 43

N.J. Stat. Ann. §34:11-4.1 .............................................. 15

N.J. Stat. Ann. §34:11-56a4 ........................................... 15

Vt. Stat. Ann. tit. 21, §§ 383-384 ................................... 15

Wis. Stat. §§ 104.01-104.02 ........................................... 15

**Regulations**

454 C.M.R. § 27.02 ....................................................... 48

454 C.M.R. § 27.04(1) ................................................... 54

454 C.M.R. § 27.04(2) ................................................... 53

956 C.M.R. § 16.02 ....................................................... 49

**Rules**

Fed. R. Civ. P. 56 ........................................................ 8

**Legislative History**

H.R. Conf. Rep. 103-677, *reprinted in* 1994 U.S.C.C.A.N.1715
        (1994)............................... 13, 14, 15, 16, 17, 18, 19, 46

Legislation to Preempt State Motor Carrier Regulations
Pertaining to Rates, Routes, and Services, Hearing before
the Subcommittee on Surface Transportation of the

xi

Committee on Public Works and Transportation, House
of Representatives, No. 103-80 (July 20, 1994) ........................... 16-17

President William J. Clinton, *Statement on Signing
Federal Aviation Administration Authorization
Act of 1994*, 2 Pub. Papers 1494 (Aug. 23, 1994) .................. 14

## STATEMENT OF THE ISSUE

Whether the Massachusetts Delivery Association established that "prong 2" of M.G.L. c. 149, § 148B, or any of the wage-and-hour provisions of M.G.L. chapters 149 and 151 that prong 2 triggers, has such a "significant impact" on an exemplar—motor-carrier's prices, routes, or services, as to be preempted by Section 14501(c)(1) of the Federal Aviation Administration Act of 1994 ("FAAAA").[1]

## JURISDICTIONAL STATEMENT

On July 8, 2015, the district court entered judgment for MDA declaring that the FAAAA preempts prong 2.  Appendix ("A.") 239-240.  The Attorney General filed a timely notice of appeal on August 5, 2015.  A. 241.  This Court has jurisdiction under 28 U.S.C. § 1291 over this appeal from the final judgment.

---

[1]     Closely related issues are pending before this Court in *Schwann v. FedEx Ground Package System, Inc.*, No. 15-1214, and *Remington v. J.B. Hunt Trans., Inc.*, No. 15-1252 (both argued November 2, 2015).  A similar issue—whether the FAAAA preempts the Illinois Wage Payment and Collection Act—is pending in *Costello v. Beavex, Inc.*, Seventh Cir. No. 15-1109, 15-1110 (argued September 18, 2015).

## STATEMENT OF THE CASE

### 1.  Nature of the Claim

MDA sued on behalf of its members, same-day delivery-service companies operating in Massachusetts.  A. 20, ¶ 1.  It sought a declaration that section 148B's prong 2 is preempted by the FAAAA.  A. 24, 208.

Section 148B is a definitional section establishing a three-prong test to determine who is an "employee" under the Commonwealth's wage-and-hour laws in M.G.L. c. 149 and 151.  M.G.L. c. 149, § 148B.  A worker is considered an employee unless the employer can prove three things, including, under prong 2, that "the service is performed outside the usual course of business of the employer[.]" *Id*., § 148B(a)(2).  MDA argues that prong 2 is FAAAA-preempted because it makes it impossible for delivery companies to treat their delivery drivers as independent contractors.  MDA SJ Mem., Doc. 157, p. 11 ("MDA Mem.").

### 2.  Procedural History

In *MDA v. Coakley*, 769 F.3d 11 (1st Cir. 2014) ("*MDA*"), this Court reversed the district court's determination that prong 2 was not FAAAA-preempted and remanded for adjudication on a full evidentiary record.  This Court instructed the district court to "credit the broad language and legislative history of the FAAAA's express preemption provision" and "engage with the real and logical effects of [section 148B]" in deciding the preemption question.  *Id*. at 14, 20.  The ultimate question is whether any effect of prong 2 on prices, routes, or services

2

rises to the level of a legally "significant impact" for FAAAA purposes.  *Id*. at 17-18.

Post-remand, the parties cross-moved for summary judgment.[2]  *See* MDA SJ Motion, Doc. 156; Attorney General's SJ Motion, Doc. 170-1 ("AG Mem."). MDA requested that the district court declare prong 2 preempted for two reasons. MDA Mem. 1.  First, MDA contended that the FAAAA preempts prong 2 as a matter of law based solely on its logical effect on motor carriers.  *Id*.  at 15-19. Second, MDA claimed the undisputed record evidence established that prong 2 had an impermissible "significant impact" on the exemplar courier company's prices, routes, and services.  *Id*. at 19-23.

The Attorney General sought summary judgment because MDA had failed to satisfy its burden of proving that prong 2 has any such "significant impact."  AG Mem. 5.  In the alternative, the Attorney General urged the court to deny MDA's motion for summary judgment because there were disputed issues of material fact as to the impacts MDA claimed satisfied its FAAAA burden.  *Id*. at 27.

---

[2]     In *MDA*, this Court noted the Attorney General's pending Rule 56(d) motion, which the district court had denied as moot.  769 F.3d at 22.  The Attorney General did not press the motion on remand, instead introducing her own evidence regarding the laws triggered by section 148B.

3.    **Summary Judgment Record**

**Undisputed Facts.**  MDA is a trade organization representing same-day

delivery service companies who provide services in Massachusetts and elsewhere.

A. 172, SMF 1.  Most MDA members provide delivery services using

independent-contractor drivers.  *Id*.  MDA selected one member, Xpressman

Trucking and Courier, Inc., to serve as the exemplar for this litigation.  *Id*., SMF 2;

A. 223.  *See also MDA*, 769 F.3d at 14.

Xpressman offers its clients both "scheduled-route"[3] and "on-demand"[4]

delivery services.  A. 173, SMF 4, Resp. 4.  It engages about 58 couriers at a given

time.  A. 175, SMF 12, Resp. 12.  About 46 couriers service Xpressman's

scheduled routes and 12 couriers service its on-demand clients.  A. 174, SMF 6, 9,

Resp. 6, 9.

---

[3]    "For scheduled-route services, Xpressman's clients dictate regular times and locations that pick-ups and/or drop-offs must be made by couriers."  A. 173, SMF 5, Resp. 5, sent. 1.

[4]    On-demand delivery services are for "unscheduled, rush deliveries."  A. 174, SMF 7.  They are "variable and unpredictable," with couriers contracted on an as-needed basis.  *Id*.  "If a client's delivery needs coincide with a courier's availability, Xpressman will offer that available courier the opportunity to make the delivery."  A. 58, ¶ 18.

Xpressman considers its couriers to be independent contractors.[5]  A. 173,

SMF 3, Resp. 3 (not disputing what Xpressman considers its couriers to be, but

explaining that classification is an issue of law).  They drive their own cars and

trucks.  *Id.*, ¶ 3.  Xpressman does not offer its couriers the benefits triggered by

section 148B's definition of employee.  A. 175-176, SMF 13, Resp. 13.  Nor does

it offer its couriers other benefits commonly associated with employee status,

including health insurance or retirement benefits, workers' compensation coverage,

or withholding of payroll and unemployment insurance taxes.[6]  *Id.*

**Disputed Assertions of Fact.**  MDA also set forth assertions of fact that it

claimed established that compliance with prong 2 has a legally "significant impact"

for FAAAA purposes on Xpressman's prices, routes, or services.  *See* A. 172-187.

The Attorney General disputed many of these assertions.  *Id.*  The disputes fall into

three categories:  challenges to (1) the legal conclusions that underlay the claimed

fact, (2) inferences MDA drew from the claimed fact, and (3) the truth of the

claimed fact.  *Id.*  The first category is addressed in Section III, *infra*, as part of the

Attorney General's argument that she is entitled to summary judgment because

---

[5]     In contrast, Xpressman classifies six full-time and two part-time
administrative and warehouse workers as employees.  A. 174-175, SMF 10-11,
Resp. 10-11.

[6]     These benefits, however, are not triggered by section 148B.  *See* Section
III.A, *infra*.

MDA has not proven that prong 2 has a legally significant impact on Xpressman's prices, routes, or services.  The second and third categories are addressed in Section IV, *infra*, as part of the Attorney General's argument for why disputes of material fact precluded the district court from granting MDA summary judgment.

### 4.    The District Court Finds Prong 2 FAAAA-Preempted

The district court ruled, based on what it concluded were either undisputed facts or logical effects, that prong 2 significantly, albeit indirectly, affected Xpressman's prices, routes, and services, in ten discrete ways.  A. 227-238.  These effects (some that the Attorney General challenged as not triggered by prong 2 and others that she contended were not supported by the undisputed evidence) were:

1. paying drivers Social Security, Medicare and federal unemployment benefits;

2. providing drivers workers' compensation insurance (as required by M.G.L. c. 152) and ensuring compliance with M.G.L. c. 62B (employer tax withholding);

3. maintaining a fleet of vehicles because "industry standards" call for employees to drive company-owned vehicles;

4. contributing to drivers' retirement plans and health insurance costs;

5. paying overtime to drivers who work more than 40 hours per week, as required by M.G.L. c. 151, § 1A;

6. tracking each employee's hours to ensure compliance with the minimum wage law, as required by M.G.L. c. 151, § 15;

7. altering any routes lasting more than six consecutive hours to accommodate the unpaid meal break required by M.G.L. c. 149, § 100;

8.  paying the labor and other costs of "stem miles" (the miles MDA claimed employee-drivers would need to drive in order to start and end their day at Xpressman's headquarters);

9.  affording drivers who work on Sunday one day off during the ensuing six days to comply with M.G.L. c. 149, § 47; and

10. cancelling "on-demand" delivery services because having to pay employee-drivers for time spent "on call," awaiting requests for such services, would make the services uneconomical.

A. 227-238.

In so holding, the district court rejected the Attorney General's argument that the assessment of impacts should be limited to statutes triggered by section 148B (*i.e.*, just the laws in M.G.L. c. 149 and 151).  A. 233-234.  *See also* AG Mem. 5-21.  It also rejected the Attorney General's argument that, even if treating Xpressman's drivers as employees under those laws might modestly increase delivery companies' labor costs, the costs associated with the laws triggered by section 148B did not affect Xpressman's prices, routes, or services in a manner that is legally "significant" under the FAAAA.  A. 235-236.  *See also* AG Mem. 17-25. Finally, it did not mention the Attorney General's arguments that the presumption against preemption, the FAAAA's legislative history, and the Supreme Court's evolving jurisprudence on ERISA preemption (the original basis for FAAAA

preemption) all combined to limit the scope of FAAAA preemption.[7]  AG Mem. 6-8.

## STANDARD OF REVIEW

This Court reviews questions of FAAAA preemption *de novo*.  *MDA*, 769 F.3d at 17.  It also reviews "the district court's granting of summary judgment de novo, drawing all reasonable inferences in favor of the non-moving party."  *Bower v. EgyptAir Airlines Co.*, 731 F.3d 85, 92 (1st Cir. 2013).  Summary judgment is appropriate if there are no genuine issues of material fact, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

## SUMMARY OF ARGUMENT

This Court has drawn the "dividing line" for both Airline Deregulation Act ("ADA") and FAAAA preemption between state laws that regulate an air or motor carrier's prices, routes, and services (preempted) and those that regulate how the carrier behaves as an employer or proprietor (not preempted).  *Tobin v. Federal Exp. Corp.*, 775 F.3d 448, 456 (1st Cir. 2014); *DiFiore v. Am. Airlines, Inc.*, 646

---

[7]     The district court also did not address the Attorney General's alternative argument that if MDA established that any specific law triggered by prong 2 had a significant impact on Xpressman's prices, routes or services, then the preemption declaration should be limited to that individual law insofar triggered by prong 2, and not prong 2 itself or the other laws it triggers that had not been shown to have such an impact.  *See* AG Mem. 24-26.

F.3d 81, 86 (1st Cir. 2011). Although section 148B merely regulates how carriers (and indeed *all* companies) operating in Massachusetts behave as employers, MDA contended, and the district court agreed, that section 148B's prong 2 falls on the preempted side of the dividing line. They viewed prong 2 as crossing that line because in their view it precludes same-day delivery companies from classifying individual-driver couriers as independent contractors, with ten resulting impacts on Xpressman's prices, routes, and services justifying summary judgment for MDA.

The district court erred. The FAAAA only preempts state enactments "related to a price, route, or service of any motor carrier … with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). Under this rubric, a state law is preempted if it expressly references, or has a "significant impact" on, a motor carrier's prices, routes, or services. Because prong 2 makes no such reference, and MDA failed to establish that compliance with prong 2 will result in a "significant impact" on Xpressman's prices, routes, or services, this Court should vacate the district court's judgment and order it to declare prong 2 not FAAAA-preempted.

Neither of MDA's arguments to the contrary below withstands scrutiny. First, MDA argued that prong 2 is FAAAA-preempted based solely on its logical effects, without consideration of record evidence. Although FAAAA preemption may sometimes be established by examining the "logical effect that a particular

9

scheme has on the delivery of services or the setting of rates," *N.H. Motor Transp. Ass'n v. Rowe*, 448 F.2d 66, 82 n.14 (1st Cir. 2006), it is simply not logical to infer a "significant impact" here. A courier's employment status is not a bargained-for element of the delivery contract entered into by a customer, who, logically, is unaware of and indifferent to whether the driver is an employee or an independent contractor under any particular law. Moreover, the carrier's interest in couriers' employment classification arises solely from the carrier's status as employer. And that economic interest is much less significant here than MDA argues, because section 148B determines employee status *only* for purposes of the Commonwealth's wage-and-hour and other basic labor protections in M.G.L. chapters 149 and 151—not all state and federal employment statutes (as MDA contends). For these reasons, prong 2 cannot be held FAAAA-preempted based on logic alone.

Second, this Court should reject MDA's argument that the record evidence shows prong 2's effects are so acute as to amount to a "significant impact" on Xpressman's prices, routes, or services. Because MDA overstates the laws actually triggered by section 148B, this Court should begin by narrowing the universe of claimed impacts to those actually attributable to section 148B. So narrowed, MDA's best case is that compliance with prong 2 indirectly results in some modest increase to Xpressman's labor costs in its capacity as an employer,

10

which this Court's decisions—along with the FAAAA's legislative history, the Supreme Court's ERISA jurisprudence, and the presumption against preemption—establish are insufficient to establish FAAAA preemption. Accordingly, because MDA cannot satisfy its FAAAA burden of proof, this Court should order summary judgment for the Attorney General.

Even if this Court determines that the Attorney General is not entitled to summary judgment, it should still vacate the grant of MDA's cross-motion. Drawing all the inferences in the Attorney General's favor (something the district court failed to do) and disregarding all claimed impacts gleaned from material facts the Attorney General disputed (something else the district court failed to do), the record evidence does not establish that the *undisputed* effects of the laws triggered by section 148B "significantly impact" Xpressman's prices, routes, or services. Thus, the district court erred in granting MDA summary judgment.

# ARGUMENT

**I.     A Ruling in MDA's Favor Would Require Expanding the Reach of FAAAA Preemption Beyond the Limits Recognized by the Supreme Court and Other Circuits, and Contrary to the Presumption Against Preemption.**

The FAAAA expressly preempts state enactments "related to a price, route, or service of any motor carrier … with respect to the transportation of property."[8] 49 U.S.C. § 14501(c)(1).  The phrase "related to" encompasses state laws "'having a connection with or reference to' carrier 'rates, routes, or services,' whether directly or indirectly."  *Dan's City Used Cars, Inc. v. Pelkey*, 133 S. Ct. 1769, 1778 (2013) (quoting *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008)). "Under this rubric, a state statute is preempted if it expressly references, or has a significant impact on, [motor] carriers' prices, routes, or services."  *MDA*, 769 F.3d at 17-18.

This Court has recognized that this test is not "easily applied":

> The difficulty is that the key connector in the statute—"related to"—is highly elastic, and so of limited help, given that countless state laws have *some* relation to the operations of [carriers] and thus *some* potential effect on the prices charged or services provided.  Equally general is the gloss supplied by the cases of a "'significant impact'

---

[8]     Congress patterned the FAAAA's "related to" language on the ADA's preemption provision, *see* 49 U.S.C. § 41713, and the two provisions have been interpreted interchangeably.  *MDA*, 769 F.3d at 17.  Although the FAAAA also includes the phrase "with respect to the transportation of property," that criterion is not disputed here.  *Id*. at 22-23.

12

related to Congress' deregulatory and pre-emption related objectives,"
rather than one merely "tenuous, remote, or peripheral."

*DiFiore*, 646 F.3d at 86 (citations omitted). And neither this Court, nor the

Supreme Court, has assessed the "significance" of a state law's indirect economic

effects on labor costs in an FAAAA preemption case. However, the FAAAA's

legislative history, the Supreme Court's analogous ERISA preemption decisions,

the decisions of other circuits, and the presumption against preemption together

compel the conclusion that FAAAA preemption should not reach as far as MDA

seeks to extend it here.

> A.   **The FAAAA's Legislative History Makes Clear Congress Intended to Preempt State Economic Regulation of Motor Carriers, But Not All Laws that Might Impose Economic Effects on Them.**

The story of FAAAA preemption begins with the ADA, which adopted a

policy of "maximum reliance on competitive market forces": both curbing federal

economic regulation of the airline industry, and—to "ensure that the [s]tates would

not undo federal deregulation"—preempting state laws "relating to the rates,

routes, or services" of air carriers. *Rowe*, 552 U.S. at 367-68 (citations and internal

quotations omitted); *see* 49 U.S.C. § 41713(b)(1). In the Motor Carrier Act of

1980, Pub. L. No. 96-296, 94 Stat. 793, Congress began similarly deregulating the

trucking industry, by reducing federal regulation of *inter*-state motor carriers, but

did not include a preemption provision barring state regulation of *intra*-state

13

carriers.  As of 1994, "41 jurisdictions" still regulated, "in varying degrees, intrastate prices, routes, and services of motor carriers."  H.R. Conf. Rep. No. 103-677 at 86 (1994) ("Conf. Rep."), *reprinted in* 1994 U.S.C.C.A.N.1715 (excerpts in Addendum).  These regulations hindered delivery companies organized as motor carriers (like UPS), because air-carrier competitors (like FedEx, at the time) were immune from similar regulation.  *Id*. at 87.

Accordingly, in 1994, Congress enacted the FAAAA's preemption for motor carriers.  As its title states, Congress' aim was the "Preemption of State *Economic Regulation* of Motor Carriers."  Pub. L. No. 103-305, § 601(c) (emphasis added). The Conference Report used that term at least nine times in explaining the section's "purpose…to preempt economic regulation by the [s]tates[.]"  Conf. Rep. at 88; *see id*. at 82-88.  Congress believed the provision would eliminate the 41-jurisdiction "patchwork" of "economic regulations," allow motor-carrier service options and prices to "be dictated by the marketplace" rather than "by an artificial regulatory structure," and put motor- and air-carriers on the same footing.  *Id*. at 87-88.

The "[t]ypical forms" of "economic regulation" Congress aimed to preempt were "entry controls, tariff filing and price regulation, and types of commodities carried."  *Id*. at 86.  Entry controls "often served to protect [incumbent] carriers" and "restrict[ed] new applicants from directly competing."  *Id*.  "[P]rice

14

regulations" artificially controlled prices and, in some cases, made it more cost-effective for carriers to ship goods out of state and back in again to avoid higher *intra*-state rates. *Id*. at 86-88. Congress sought to eliminate this "patchwork" of state economic regulations that imposed "significant inefficiencies, increased costs, [and] reduc[ed …] competition."[9] *Id*. at 87.

The Conference Report, however, makes clear that Congress did not intend to immunize motor carriers from all state regulation that might have economic effects. Conf. Rep. at 86. For instance, Congress did not intend the provision to "change the application of [s]tate tax laws to motor carriers," *id*. at 85, despite such laws' obvious impact on motor-carrier "prices." Likewise, Congress emphasized that state laws governing "safety, financial responsibility relating to insurance, transportation of household goods, vehicle size and weight and hazardous materials routing" were "not a price, route, or service" regulation and thus were not preempted. *Id*. at 84. Congress further indicated that "[t]his list [wa]s not intended to be all inclusive, but merely to specify some of the matters which are not 'prices, r[ou]tes, or services' and which are therefore not preempted." *Id*. at 84.

---

[9] The President's signing statement confirmed that FAAAA preemption was aimed at state "controls on who can enter the trucking industry," "what they can carry and where they can carry it, and whether competitors can ... arrange among themselves how much to charge[.]" Statement on Signing the FAAAA of 1994, 2 Pub. Papers 1494 (Aug. 23, 1994), *reprinted in* 1994 U.S.C.C.A.N. 1762-1.

Additionally, Congress recognized ten jurisdictions that did *not* regulate "intrastate prices, routes and services of motor carriers."  Conf. Rep. at 86.  Of those ten, eight had minimum-wage laws, each with its own definitional section (and rate), and seven had prevailing-wage laws.[10]

Congress thus did not view the variation among state labor regulations as part of the objectionable "patchwork" of anti-competitive "economic regulation." Congress was concerned instead with "'a patchwork of state *service-determining* laws,'" *Dan's City*, 133 S. Ct. at 1780 (emphasis added; quoting *Rowe*, 552 U.S. at 373), and price- or route-determining laws as well.  But Congress did not prohibit *all* state motor-carrier laws that differed from one another.  Congress recognized that states could continue to tax motor carriers and to have their own laws regulating motor-carrier safety, size/weight/hazardous cargo, and insurance, Conf. Rep. at 84-85, and voiced no concern about states' differing minimum-wage and prevailing-wage laws.

---

[10]    *See* Alaska Stat. §§ 23.10.065 & 23.10.145 (1990); Del. Code Ann. tit. 19, §§ 901-902 (1990); 1992 D.C. Laws 9-248, codified at D.C. Code §§ 36-220 & 36-220.2 (1992); Me. Rev. Stat. tit. 26, §§ 663-664 (1993); Md. Code Ann., Lab. & Empl. §§ 3-401, 3-413 (1992); 1990 N.J. Sess. Law Serv. 18, codified at N.J. Stat. Ann. § 34:11-56a4 (1990), 34:11-4.1 (1991); Vt. Stat. Ann. tit. 21, §§ 383-384 (1993)(not including prevailing-wage provision); Wis. Stat. §§ 104.01-104.02 (1975).

Nor did Congress intend preemption to alter the balance of power between employers and employees.  *See* Conf. Rep. at 88 (explaining provision's purpose "to preempt economic regulation by the [s]tates, not to alter, determine or affect in any way … whether any carrier is or should be covered by one labor statute or another, or the status of any collective bargaining agreement").[11]

Also, Congress showed no concern for protecting carriers' ability to use independent-contractor drivers.  The Conference Report, in discussing how a few states had begun to deregulate trucking but had not gone far enough, mentioned a California law that extended a regulatory exemption to motor carriers affiliated with air carriers, but denied it to carriers using a high proportion of independent-contractor drivers.  *Id.* at 87.  From this the conferees concluded, "Despite the movement toward deregulation by some individual states, the conferees believe preemption legislation is in the public interest[.]"  *Id.*  This example shows only

---

[11]     The conferees were referring to whether the preemption provision would allow motor carriers (like UPS) to escape coverage under the National Labor Relations Act, by asserting that they were air carriers (like FedEx) under the Railway Labor Act.  Conf. Rep. at 88; *see* "Legislation To Preempt State Motor Carrier Regulations Pertaining to Rates, Routes, and Services," Hearing before the Subcommittee on Surface Transportation of the Committee on Public Works and Transportation, House of Representatives, No. 103-80, at 86, 89 (July 20, 1994), available at https://ia700406.us.archive.org/27/items/legislationtopre00unit/ legislationtopre00unit.pdf (last visited November 15, 2015).  The Teamsters had testified during the House hearings to their view that that the RLA was more favorable to carriers, allowing them to escape existing labor agreements.  *Id.*

17

that Congress wanted deregulation extended to *all* motor carriers, not that it had

any special concern for how states defined employment relationships.  *Id*.

In sum, when Congress preempted the anti-competitive "patchwork" of

"economic regulation" that had burdened the transportation market, it intended to

preempt laws that substituted state commands for free-market forces in

determining motor carriers' prices, routes, or services.  Congress may also have

intended to preempt state laws whose indirect economic effects were so acute as to

effectively mandate (or prohibit) a particular price, route, or service. Congress

recognized that FAAAA-preemption left states with an area of "unaffected

regulatory authority," although, to be sure, such authority was not to be used "as a

guise for continued economic regulation as it relates to prices, routes or services."

Conf. Rep. at 87.  But, as Congress stated in its "Findings," its focus was on

burdensome "regulation of intrastate transportation of property by the [s]tates," and

it therefore preempted only "*certain* aspects of the [s]tate regulatory process."

Pub. L. 103-305, § 601(a)(1) (emphasis added).

**B.    Neither the Supreme Court Nor this Court Has Addressed When a State Law's Indirect Economic Effects Can Lead to ADA or FAAAA Preemption.**

The Supreme Court has considered the ADA's and FAAAA's preemptive

reach with respect to state laws that *reference* carriers' prices, routes, or services,

or *directly regulate* the carrier-customer relationship, on five occasions.  In each

18

instance, the Court has held the state law preempted.  But it has never addressed the question presented here: whether and when a state law's indirect economic effects could cause such preemption.

First, in *Morales v. Trans World Airlines*, 504 U.S. 374 (1992), the Court interpreted the ADA's "related to" language as having the same meaning as in ERISA's preemption clause.  The Court explained that just as "a state law 'relates to' an employee benefit plan, and is pre-empted by ERISA, 'if it has a connection with, or reference to, such a plan,'" *Id.* at 384 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983)),[12] so, too, would state laws "having a connection with or reference to airline "[prices],[13] routes, or services [be] pre-empted" under the ADA.  *Id.* at 384.  By contrast, again borrowing from ERISA cases, state laws affecting prices, routes, or services "in too tenuous, remote, or peripheral a manner" are not preempted.  *Id.* at 390 (quoting *Shaw*, 463 U.S. at 100 n.21). *Morales* anticipated that, just as with ERISA, future cases would present closer

---

[12]     In *Shaw*, the Court explained that while a state "may not require an employer to alter its ERISA plan, it may force the employer to choose between providing disability benefits in a separately administered plan and including the state-mandated benefits in its ERISA plan." 463 U.S. at 108.  In other words, while a state may not direct the terms of the ERISA plan, "relate to" preemption does not preclude a state from setting a floor for the level of benefits that employers in the state must provide in some fashion.  *Id.*

[13]     When *Morales* was decided, the ADA's preemption clause referred to "rates," 504 U.S. at 384, but the FAAAA amended the ADA clause, changing "rates" to "prices," to mirror the FAAAA.  Conf. Rep. at 83.

questions "about where it would be appropriate to draw the line" between a "significant impact" and an effect that is "tenuous, remote or peripheral." *Id*. Applying the test, the Court held that the ADA preempted state laws that substantially regulated all aspects of airline fare advertisements to customers. *Id*. at 388.

Second, in *American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995), the Court held that the ADA preempted state regulation of an airline's frequent flyer program, because the law sought to "guide and police the marketing practices of airlines." 513 U.S. at 228. The Court, however, allowed the *Wolens* plaintiff's separate breach-of-contract claims to survive ADA preemption, because they sought to enforce "privately ordered obligations" regarding the terms of the airline's frequent flyer program, to which the carrier and customer had voluntarily agreed. *Id*. at 228-229.

Third, in *Rowe*, the Court considered whether the FAAAA preempted a state law that forbade tobacco retailers from employing a delivery service unless that service followed particular delivery procedures. 552 U.S. at 371-372. It began its analysis by extending *Shaw*'s "relate to" standard to the FAAAA. *See id*. at 370. Then, "conced[ing] that the regulation [at issue] [wa]s less 'direct' than it might be, for it tells *shippers* what to choose rather than *carriers* what to do," the Court held that the FAAAA still preempted the law because it was "aim[ed] directly at the

20

carriage of goods" and, in effect, regulated "carrier delivery services themselves."
*Id*. at 372, 376 (emphasis in original).  The law, in other words, impermissibly
regulated the carrier-customer relationship by telling the carrier—through the
tobacco shipper—exactly how the goods must be delivered.

Fourth, *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 133 S. Ct.
2096 (2013),  also arose from state interference with the carrier-customer
relationship—this time in the form of two provisions in agreements trucking
companies were required to sign before they could transport cargo from freight-
terminal operators at a city port.  *Id*. at 2102-04 (provisions requiring companies to
develop off-street parking plans and display designated placards on vehicles).  But
the Court had no need to address whether the provisions related to motor-carrier
prices, routes, or services, because "[a]ll parties agree[d]" that they did.  *Id*. at
2102.  Rather, the Court determined merely that the provisions, although
enforceable only "indirect[ly]" (through criminal sanctions imposed on the port's
freight-terminal operators rather than on carriers themselves), satisfied the
FAAAA's "force and effect of law" requirement.  *Id*. at 2103-04.

Finally, in *Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1422 (2014), the Court
held that the ADA preempted a customer's state-law claim that the airline breached
the implied covenant of good faith and fair dealing when it revoked his "Platinum
Elite" status in its frequent-flyer program.  *Id*. at 1430-31.  Due to the connection

21

between the airline's frequent-flyer program and its rates and services, the Court held that allowing the claim to proceed would mean inserting a state-imposed obligation into the carrier-customer relationship. *Id*. at 1430-31. The particular implied covenant at issue was dependent on "community standards" and so could not simply be viewed as an attempt to vindicate the parties' own understanding of the contract. *Id*. at 1431-32.

In sum, these five ADA and FAAAA cases establish that a state law is preempted if it expressly references a carrier's prices, routes, or services, or directly regulates relations between carriers and their customers. Although some of the cases recognize that a state law's "indirect" effects may trigger ADA and FAAAA preemption, *Rowe*, 552 U.S. at 370 (quoting *Morales*, 504 U.S. at 386), the only "indirect" effects found sufficient to date have been those that regulated carriers through the device of regulating customers' choice of carriers.

Like the Supreme Court, this Court's cases have addressed state laws that expressly referenced a carrier's prices, routes, or services, or directly regulated the carrier-customer relationship. *See Overka v. American Airlines, Inc.*, 790 F.3d 36, 38-41 (1ˢᵗ Cir. 2015) (ADA preempts state-law claims that sought to regulate how airline performed baggage-check-in service for customers); *Tobin*, 775 F.3d at 455 (ADA preempts state common-law claims that would "prescribe protocols for [air carrier's] package labeling, verification, and delivery" to customers); *Bower*, 731

F.3d at 96-97 (ADA preempted customer's negligence claim against airline for failure to screen boarding passengers to prevent child abductions); *DiFiore*, 646 F.3d at 88 (law that "directly regulates how an airline [bag-check-in] service is performed and how its price is displayed to customers—not merely how the airline behaves as an employer or proprietor" is ADA-preempted).

Although this Court has not yet decided whether and when the indirect economic effects of regulating a carrier as an employer can rise to the level of having a legally "significant impact" on carrier prices, routes, or services so as to be FAAAA-preempted, the Court has already refused to "endorse [a carrier's] view that state regulation is preempted wherever it imposes costs on [carriers] and therefore affects fares because costs 'must be made up elsewhere, *i.e.*, other prices raised or charges imposed.'" *DiFiore*, 646 F.3d at 89.  As the Court recognized, such a ruling "would effectively exempt [carriers] from state taxes, state lawsuits of many kinds, and perhaps most state regulation of any consequence." *Id.*

### C.     The Supreme Court's ERISA Cases Show that a State Law's Indirect Economic Effects Can Also Lead to "Relate To" Preemption, But Only Where the Effects are So Acute as to Effectively Mandate (or Prohibit) a Particular Price, Route, or Service.

Although the Supreme Court and this Court have yet to squarely address when a state law's indirect economic effects *can* lead to ADA or FAAAA preemption, the Supreme Court's post-*Shaw* ERISA cases strongly suggest that the

23

Supreme Court would not extend the FAAAA's preemptive reach to laws that affect a carrier only in its capacity as employer and result only in indirect economic effects in the form of somewhat increased labor costs.

In the first case, *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, the Court refused to find preempted a law imposing surcharges on hospital bills paid by commercial insurers, even though the surcharge could incentivize ERISA plans to purchase insurance from Blue Cross/Blue Shield instead of commercial insurers and "thus have an indirect economic effect on choices made by...ERISA plans." 514 U.S. 645, 649-50, 659 (1995). Because ERISA intended to preempt "state laws that *mandated* employee benefit structures or their administration," *id*. at 658 (emphasis added), the surcharge law's "indirect economic effect" was insufficient to "relate to" or have a "connection with" ERISA plans. *Id*. at 656. *See also id*. at 659-60 ("[a]n indirect economic influence ... does not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself"). Otherwise, the Court explained, many other state laws could be deemed to indirectly affect an ERISA plan's costs—"[e]ven basic regulation of employment conditions [that] invariably affect the cost and price of services." *Id*. at 660; *see also id*. at 661 (explaining such laws had "only a tenuous, remote, or peripheral connection with covered plans"). The Court acknowledged that "a state law might produce such *acute*, albeit indirect, economic

24

effects...as to force an ERISA plan to adopt a certain scheme of substantive
coverage or effectively restrict its choice of insurers" and thus possibly be
preempted—but the state laws in *Travelers* did neither.  514 U.S. at 668 (emphasis
added).  Rather, they "affect[ed] only indirectly the relative prices of insurance
policies, a result no different from myriad state laws in areas traditionally subject
to local regulation, which Congress could not possibly have intended to eliminate."
514 U.S. at 668.[14]

Two years later, the Court ruled that California's prevailing-wage law,
which created economic incentives for "ERISA-covered apprenticeship programs"
to meet state apprenticeship standards, was not preempted, because it merely
"alter[ed] the incentives, but d[id] not dictate the choices, facing ERISA plans."
*Cal. Div. of Labor Stds. Enf. v. Dillingham Constr.*, 519 U.S. 316, 332, 334 (1997).
Prevailing-wage laws and apprenticeship standards were "quite remote from the
areas with which ERISA is expressly concerned," *id*. at 330, and the Court could
not preempt "a state law in an area of traditional state regulation based on so

---

[14]    *See also De Buono v. NYSA-ILA Medical & Clinical Services Fund*, 520
U.S. 806, 816 n.16 (1997) (same); *Californians for Safe & Competitive Dump
Truck Transp. v. Mendonca*, 152 F.3d 1184, 1188 (9th Cir. 1998) (same in FAAAA
context).  Notably, no federal Court of Appeals has held a state law preempted by
ERISA (or the FAAAA or ADA) because of its "acute … economic effects,"
which is a "high standard."  *Hattem v. Schwarzenegger*, 449 F.3d 423, 432 (2nd
Cir. 2006).

tenuous a relation without doing grave violence to our presumption that Congress intended nothing of the sort." *Id.* at 334. California's prevailing-wage laws and apprenticeship standards thus had no "connection with," and did not "relate to," ERISA plans. *Id.*

Finally, the Court has ruled that a state law taxing certain health facilities, including those used or operated by ERISA plans, was among "'myriad state laws'" that "impose some burdens on the administration of ERISA plans but nevertheless do not 'relate to' them within the meaning of [ERISA]." *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 816-17 (1997) (quoting *Travelers*). Although the assessment gave ERISA plans a choice between covering "a more limited range of services" and charging "higher rates," *id.* at 816, this was insufficient to cause preemption. "Any state tax, or other law, that increases the cost of providing benefits to covered employees will have some effect on the administration of ERISA plans, but that simply cannot mean that every state law with such an effect is pre-empted[.]" *Id.*

This Court has previously felt constrained in FAAAA and ADA cases to follow the ERISA-preemption approach existing at the time of *Morales*, notwithstanding the Supreme Court's subsequent refinements. *See, e.g.*, *Rowe*, 448 F.3d at 76. But *Morales* itself forecast further refinement, 504 U.S. at 390, and three Circuits—the Second, Ninth, and Eleventh—have relied upon *Travelers*

26

to ascertain when a state law's indirect economic effects trigger ADA and FAAAA preemption. *See Abdu-Brisson v. Delta Air Lines, Inc.,* 128 F.3d 77, 82-83 (2nd Cir. 1997); *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1188-89 (9th Cir. 1998); *Amerijet Int'l, Inc. v. Miami-Dade Cty.*, __ Fed. Appx. __, 2015 WL 5515343, *5 (11th Cir. 2015) (increases in carrier's costs attributable to living-wage ordinance are indirect economic influences, insufficient to establish ADA preemption). Further, this Court is now free to look to ERISA cases, because in 2013 the Supreme Court cited a post-*Morales* ERISA case in limiting FAAAA preemption. *Dan's City*, 133 S. Ct. at 1778 (citing *Travelers* as evidence that "the breadth of the words 'related to' does not mean the sky is the limit").

Accordingly, it is altogether appropriate that this Court be guided by the Supreme Court's ERISA decisions. Indeed, because the ADA's and FAAAA's "relate to" standard originated in *Shaw*, this Court—like the Second, Ninth, and Eleventh Circuits—should look to post-*Shaw* cases to inform when indirect economic effects lead to "relate to" preemption. The test it should apply is whether the provision's indirect economic effects are so acute as to mandate or prohibit the carrier's offering a particular price, route or service, thereby effectively regulating such matters. *Travelers*, 514 U.S. at 659-60. *See also Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 646 (9th Cir. 2014) (where "a law does not

27

refer directly to [prices], routes, or services, the proper inquiry is whether the provision, directly or indirectly, *binds* the carrier to a particular price, route or service and thereby interferes with the competitive market forces within the industry") (emphasis the court's; internal quotations and citation omitted).

### D. Circuit Courts Addressing State Laws that Impose Indirect Economic Effects on a Carrier Through Increased Labor Costs Have Yet to Find the Effects Sufficient to Trigger FAAAA or ADA Preemption.

Outside this Circuit, state employment laws' indirect economic effects have been insufficient to cause FAAAA or ADA preemption.  First, in 1998, the Ninth Circuit held the FAAAA did not preempt California's "prevailing wage" statute, in the process rejecting the employer's "higher cost equals preemption" argument.  *See Mendonca*, 152 F.3d at 1186, 1189 (employer claiming law would result in 25% price increase).  Then, in 2012, the Seventh Circuit concluded that state laws regulating "inputs" to the operations of motor carriers—such as "labor inputs...affected by a network of labor laws"—were not FAAAA-preempted merely because such laws could increase labor costs and thus affect carrier prices or services.  *See S.C. Johnson & Son, Inc. v. Trans. Corp. of Am.*, *Inc.*, 697 F.3d 544, 558 (7th Cir. 2012) (such laws "operate one or more steps away from the moment at which the [carrier] offers its customer a service for a particular price").

More recently, the Ninth Circuit held that the FAAAA does not preempt laws mandating meal- and rest-breaks even though they modestly increase labor

28

costs for trucking companies. *Dilts*, 769 F.3d at 647-49. Similarly, the Eleventh Circuit held that an increase in a carrier's costs attributable to a living-wage ordinance was an indirect economic influence and insufficient to establish ADA preemption. *Amerijet*, __ Fed. Appx. __, 2015 WL 5515343, *5.

Although this Court has described the "shorthand" approach that the Seventh and Ninth Circuits used to characterize the laws as "not … helpful," it has not yet engaged those decisions' merits. *See MDA*, 769 F.3d at 19. It should now. Those cases establish that a mere increase in labor costs, which in turn may indirectly raise the price of the carrier's services, is typically insufficient to trigger "relate to" preemption. *S.C. Johnson*, 697 F.3d at 558 ("no one thinks that the ADA or the FAAAA preempts" minimum-wage laws); *Dilts*, 769 F.3d at 647-49; *Mendonca*, 152 F.3d at 1189; *Amerijet*, __ Fed. Appx. __, 2015 WL 5515343, *5. Such a holding is not only the consensus among other circuits, but is also consistent with this Court's prediction in *DiFiore* that the "Supreme Court would be unlikely ... to free airlines from ... prevailing wage laws." 646 F.3d at 87.

## E. The Presumption Against Preemption of State Labor Laws Weighs Against Finding FAAAA Preemption Here.

"In all pre-emption cases, and particularly in those in which Congress has 'legislated...in a field which the [s]tates have traditionally occupied,'" the Supreme Court "'start[s] with the assumption that the historic police powers of the [s]tates were not to be superseded by the Federal Act unless that was the clear and manifest

purpose of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting

*Medtronic, Inc. v. Lohr*, 518 U. S. 470, 485 (1996)).  The Supreme Court invokes

this presumption when construing both ERISA's and the FAAAA's preemption

provisions.  *Columbus v. Ours Garage & Wrecker Serv.*, 536 U.S. 424, 438 (2002)

(quoting *Medtronic*, 518 U.S. at 485); *see also Dan's City*, 133 S. Ct. at 1778

(citing *Travelers*, 514 U.S. at 655-56 (discussing presumption)).  Under the

presumption, this Court can hold section 148B preempted only if it is "clear and

manifest" that Congress meant the FAAAA's "relate to" preemption clause to

reach labor-protection laws that have only indirect economic effects on carriers'

prices, routes, or services.

> ### 1. The Presumption Protects States and Their Citizens Against Inadvertent Surrender of Traditional State Powers Like the Regulation of Employment.

This presumption is especially important here, where MDA advances the

implausible claim that Congress, in enacting the FAAAA, intended to preempt the

definition of "employee" that triggers the Commonwealth's wage-and-hour laws in

chapters 149 and 151.  It would likely come as a great surprise to the members of

Congress who enacted the FAAAA to learn that they had voted to displace basic

labor-protection laws.[15]  *Sossamon v. Texas*, 131 S. Ct. 1651, 1661 (2011) (the

---

[15]     The presumption against preemption, like other clear-statement rules, helps avoid needless federal-state friction by ensuring that federal laws do not upset "the

(footnote continued)

presumption and its associated clear-statement rule allow states to protect their interests against unwitting erosion by "broad or general language" in federal legislation) (citation and internal quotations omitted).

Here, the FAAAA's general language preempting state laws "related to a price, route, or service of a motor carrier"—even as further explained by the conferees' reference to *Morales* (defining "related to" as "having a connection with or reference to," 504 U.S. at 384)—would not have put states on notice that their representatives in Congress were about to preempt state labor-protection laws lacking any apparent "connection with" or "reference to" carrier prices, routes, or services.

Moreover, laws like section 148B are those with respect to which the presumption should have greatest force. The presumption is "particularly strong" in the area of "'establishment of labor standards ....'" *R.I. Hospitality Ass'n v. City of Providence ex rel. Lombardi*, 667 F.3d 17, 46 (1st Cir. 2011) (Stahl, J., concurring) (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987)).

———————————

(footnote continued)
federal-state balance" and invade the states' traditional powers except to the extent Congress intended. *Jones v. Rath Packing Co.*, 430 U.S. 159, 525 (1977). "'In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that [Congress] has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.'" *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65-66 (1989) (quoting *United States v. Bass*, 404 U.S. 336, 349 (1971)).

The Supreme Court has cautioned that "pre-emption should not be lightly inferred in this area," particularly where—as is true here—"[t]he evil Congress was addressing was ... entirely unrelated to local or federal regulation establishing minimum terms of employment." *Fort Halifax*, 482 U.S. at 21 (internal quotations and citation omitted).

### 2.    The Presumption Applies in FAAAA Cases.

This Court has acknowledged that the presumption against preemption, together with the focus on congressional intent, are the "'two cornerstones of our pre-emption jurisprudence[.]'" *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 173 (1st Cir. 2009) (quoting *Wyeth*, 555 U.S. at 565). In ADA cases, however, this Court has treated the presumption either as inapplicable—due to the historic, pervasive federal regulation of air carriers[16]—or as overcome, given the state law's direct regulation of the carrier-customer relationship and significant impact on air-carrier prices, routes, or services.[17] But none of those ADA decisions means the presumption is inapplicable or is overcome here.[18]

---

[16]    *Brown v. United Airlines*, 720 F.3d 60, 68 (1st Cir. 2013); *United Parcel Service, Inc., v. Flores-Galarza*, 318 F.3d 323, 336 (1st Cir. 2003); *see id.* at 327, 334-35 & n.17 (also citing FAAAA, but only to refer to its recodification of the ADA's preemption clause).

[17]    *DiFiore*, 646 F.3d at 86, 87-88 (tips law regulated how airline performed baggage service and displayed service's price to customers); *see Tobin*, 775 F.3d at 456 (tort claims for air-carrier's mis-delivery of package); *Buck v. American*

(footnote continued)

First, the Supreme Court has now clarified that the presumption applies "[i]n all pre-emption cases," *Wyeth*, 555 U.S. at 565, calling into question those ADA decisions finding it inapplicable. Second, the question "whether the presumption has been overcome" cannot be answered once and for all time, with respect to the ADA, FAAAA, or any other federal law. Rather, the answer depends on the particular state law claimed to be preempted, and whether it was "the clear and manifest purpose of Congress" to supersede that *particular type* of state law. As the Supreme Court has repeatedly said in the analogous ERISA context, "In order

---

(footnote continued)

*Airlines*, 476 F.3d 29 (1st Cir. 2007) (customers' state-law claims seeking partial refunds of airline ticket prices). *Tobin* and *Buck* did not discuss the presumption, perhaps because the state laws' direct and significant regulatory impact was manifest.

[18] This Court observed in *DiFiore* that the Supreme Court had declined to apply the presumption in three ADA or FAAAA cases involving areas of traditional state concern: *Morales*, 504 U.S. at 388 (deceptive advertising laws); *Wolens*, 513 U.S. at 228 (consumer protection law); and *Rowe*, 552 U.S. at 367 (public health law). 646 F.3d at 86. But in those cases, the state laws plainly regulated the carrier-customer relationship, either directly, by regulating carriers' conduct towards customers, as in *Morales*, *Wolens*, and *Rowe*, 552 U.S. 372-73, or indirectly, by requiring shippers to use only those carriers that provided "recipient-verification" delivery services. *Rowe*, 552 U.S. at 368, 371-72. That those laws were motivated by traditional state concerns, rather than aimed at economic regulation of the carrier-customer relationship, did not change the fact that they *did* regulate that relationship—regulation that Congress had a "clear and manifest purpose to preempt." *DiFiore*, 646 F.3d at 86. Thus, the presumption against preemption was overcome as to *those* laws. But where a law both is aimed at a traditional state concern like employee protection, and does *not* regulate the carrier-customer relationship directly or indirectly, the presumption remains in full force.

to evaluate whether the normal presumption against pre-emption has been

overcome in a particular case, ... we 'must go beyond the unhelpful text and the

frustrating difficulty of defining its key term ['relates to'], and look instead to the

objectives of the ... statute as a guide to the scope of the state law that Congress

understood would survive."[19]  *De Buono*, 520 U.S. at 813-14 (quoting *Travelers*,

514 U.S. at 656; citing *Dillingham*, 519 U.S. at 325).

---

[19]     For these same reasons, this Court's pre-*Wyeth* FAAAA-preemption ruling
in *Rowe* does not mean that the presumption is inapplicable or overcome in all
FAAAA cases.  *Compare Rowe*, 448 F.3d at 74 n.10 (expressing uncertainty about
whether presumption applied "in all pre-emption cases" or only those with no
"history of significant federal presence"), *with Wyeth,* 555 U.S. at 565 & n.3
(holding that presumption applies "[i]n *all* pre-emption cases" and "does *not* rely
on the absence of federal regulation") (emphasis added).

       This Court in *Rowe* also said that, even if the presumption applied, it was
overcome because Congress' "intent to preempt state police-power enactments that
are related to carrier prices, routes, or services [wa]s sufficiently clear[.]"  448 F.3d
at 74 n.10.  But such an express preemption clause does not render the presumption
inapplicable or irrelevant.  As the Supreme Court later clarified in *Altria Group v.
Good*, 555 U.S. 70, 76-77 (2008), in express preemption cases, the presumption
applies to limit the scope of ambiguous preemption clauses, which the FAAAA's
surely is.  Because even express preemption clauses leave questions open about
"the substance and scope of Congress' displacement of state law," the presumption
requires that, "when the text of a pre-emption clause has more than one plausible
reading, courts ordinarily accept the reading that disfavors pre-emption."  *Id*.
(internal quotations omitted).  Applying the presumption "to support a narrow
interpretation of such an express [preemption clause] ... is consistent with both
federalism concerns and the historic primacy of state regulation of matters of
health and safety."  *Medtronic*, 518 U.S. at 485.  State labor-protection regulations
have equal "historic primacy."

In sum, the presumption against preemption fully applies here, and means that neither section 148B nor any of the wage-and-hour laws it triggers in chapters 149 and 151 is preempted unless this Court concludes that it was the "clear and manifest purpose of Congress" to do so. *Wyeth*, 555 U.S. at 565; *Columbus*, 536 U.S. at 438.

## II.  The FAAAA Does Not Preempt Prong 2 as Matter of Law Based Solely on its Logical Effects and Without Consideration of the Evidence.

MDA's lead argument below was that the district court should declare prong 2 FAAAA-preempted based solely on its logical effects (and without considering record evidence). *See* MDA Mem. 15-19. Although FAAAA preemption may sometimes be established by looking at the "logical effect that a particular scheme has on the delivery of services or the setting of rates," *Rowe*, 448 F.2d at 82 n.14, that approach is insufficient to find preemption here.

First, a courier's employment status is not a bargained-for element of the delivery contract entered into by a customer. Instead the customer is contracting for the delivery of the package. *See Tobin*, 775 F.3d at 453 ("'service' represents a 'bargained-for or anticipated provision of labor from one party to another,' thus leading to a 'concern with the contractual arrangement between the [motor carrier] and the user of the service'"); *see also Branche v. Airtran Airways, Inc.*, 342 F.3d 1248, 1258 (11th Cir. 2003) ("services" do not "include those aspects of airline operations that are not bargained-for by carriers and their passengers"). Thus, the

employment status of the person performing the services is of no import to the customer.

Second, while the carrier may have an economic interest in the courier's employment classification, that interest arises from the carrier's status as employer. Because this Court has already said that laws regulating how the carrier behaves as employer fall on the not-preempted side of the "dividing line," logic alone cannot justify preemption here. *See Tobin*, 775 F.3d at 456; *DiFiore*, 646 F.3d at 86. Like a hypothetical increase in a fuel tax, increased labor costs do not *logically* have an impact that is "significant" for FAAAA purposes. The FAAAA meant to preempt state regulation of the market for motor-carriers' property-transportation services (*i.e.*, the carrier-customer relationship), not state regulation of secondary markets like those for labor (the carrier-employee relationship) and materials that may affect motor carriers' costs.

Third, the carrier's economic interest in classification under prong 2 is much less significant than MDA "logically" portrays it to be, because section 148B merely determines who is an "employee" for the limited purposes of M.G.L. chapters 149 and 151, and not all state and federal employment statutes (as MDA contends). Put differently, if an employer cannot satisfy one or more prongs of section 148B—*e.g.*, if Xpressman cannot prove that drivers perform services "outside the usual course of [its] business"—then section 148B merely requires

36

that Xpressman afford its drivers the protections of chapters 149 and 151.

Xpressman remains free to choose who will serve as its drivers and to treat them as

independent contractors for purposes of all other state and federal laws, assuming

they do not meet those laws' varying definitions of "employee."[20]  Instead of

speculating as to what prong 2's "potential" logical effects might be,[21] this Court

should engage the record evidence, which, as discussed in Section III, does not

support MDA's argument.

Fourth, MDA lacks standing to argue that section 148B is logically

preempted due to its effect on out-of-state carriers.  *See Friends of the Earth, Inc. v.*

*Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000) (associational standing

requires that members have standing to sue in their own right).  The most MDA's

---

[20]     For this reason, the dicta in *People v. Pac Anchor Transp., Inc.*, 329 P. 3d
180, 189 (Cal. 2014), regarding the state preventing a carrier from using
independent contractors *at all* is distinguishable.  Nor does *Pac Anchor*'s dicta
push MDA's logical-effects claim any further, as the California Supreme Court's
ultimate holding was that the state's action against the carrier, not to prevent it
from engaging independent-contractor drivers but to prevent it from misclassifying
its employee-drivers as independent contractors, was not-FAAAA preempted.  *Id*.

[21]     The "potential" logical effects that this Court has said could lead to
preemption, *MDA*, 769 F.3d at 21, must be more than merely "possible" effects.
To be considered "significant," such "potential" effects must be sufficiently certain
to occur that a court can fairly treat them as established, without the need for
evidence, and without affording the state (or other party opposing preemption) the
opportunity to present contrary evidence.  *See id*. (statute's "potential" impact on
carriers' prices, routes, and services is insufficient if merely "tenuous, remote, or
peripheral").

37

amended complaint says is that its members make deliveries "through the state and across state lines." A. 21 (¶ 6), 24 (¶ 15). Nor does MDA offer evidence that its members are harmed by any difference between prong 2 and other states' laws.[22]

Finally, *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ("*ATA*") (*reversing ATA v. City of Los Angeles*, 577 F. Supp. 2d 1110 (C.D. Cal. 2008)), does not compel a different result (as MDA contended below). The case involved an FAAAA preemption challenge to City-imposed "concession agreements" requiring that motor carriers, in order to enter and transport goods in the Port of Los Angeles, make a host of changes to their operations, including either purchasing new trucks or retrofitting their old ones to meet "Clean Trucks Program" emissions requirements, and phasing out independent-contractor drivers. 577 F. Supp. 2d at 1114-15, 559 F.3d at 1049-50. There, both in the district court (577 F. Supp. 2d at 1117) and on appeal, "the agreements' effects on prices and services w[ere] undisputed," 559 F.3d at 1051, 1053, and the question instead was whether each provision of the agreements fell

---

[22]    For similar reasons, MDA cannot make an *interstate* impact argument like the one addressed in *Central Transport, Inc. v. Public Service Commission*, 566 N.W.2d 299, (Mich. Ct. App. 1997), a case that in any event concerned a state law expressly referring to motor carriers *and* constituting a "barrier to entry" for many interstate carriers. *Id*. at 307-308; *see* Part I.A. *supra* (FAAAA legislative history showing intent to prohibit states' "entry controls")

within the "safety-regulation" exception to FAAAA-preemption.  *Id*. at 1055.[23]

The Ninth Circuit pointed to a "vast increase in capital requirements for the

purchase of equipment and personnel expenditures to turn independent contractors

into employees," 559 F.3d at 1058, but the "purchase of equipment" was a separate

consequence of the concession agreements, and is not a logical or necessary

consequence of 148B.  There is no requirement here that courier companies

purchase vehicles for their employee drivers, and whether there would be any

significant impact on personnel expenditures is sharply disputed.  In any event, at

bottom, *ATA* fits neatly in the express reference rubric, and so is a far cry from

section 148B.

Consequently, MDA cannot establish that the FAAAA preempts prong 2 as

a matter of law based solely on its logical effects and without consideration of the

record evidence.

---

[23]    Likewise, later in the litigation, the independent contractor provision's
relationship to prices, routes or services was again "not challenge[d] ... on appeal,"
the question instead being whether the provision fell within a "market-participant
exception" to the FAAAA.  *ATA v. City of Los Angeles*, 660 F.3d 384, 407 (9th Cir.
2011), *rev'd on other grounds*, 133 S. Ct. 2096 (2013).

**III.    Because MDA Cannot Show that Either Section 148B or Any of the Wage-and-Hour Laws It Triggers Has a "Significant Impact" on Xpressman's Prices, Routes, or Services, the Attorney General, Not MDA, Was Entitled to Summary Judgment.**

MDA's fallback summary judgment argument—that the undisputed facts show prong 2 has a "significant impact" on Xpressman's prices, routes, or services and therefore is FAAAA-preempted—is not supported by the record evidence. MDA's argument in this regard is that compliance with prong 2 will indirectly result in some increased labor costs to Xpressman in its capacity as an employer, something this Court has already said does not trigger FAAAA preemption. Any incidental increases in labor costs are not so acute as to "significantly impact" Xpressman's prices, routes or services in the sense of effectively mandating (or prohibiting) a price, route or service. Accordingly, the district court erred in granting summary judgment to MDA rather than the Attorney General.

**A.    MDA Did Not and Cannot Establish that Prong 2's Indirect Effects Amount to a "Significant Impact" on Xpressman's Prices.**

Both MDA and the district court overstated the range of laws triggered by prong 2, the economic effects of those laws actually triggered, and the impact of prong 2 on Xpressman's prices. Because the actual impact was indirect, limited to increases in Xpressman's labor input costs, and not "acute," MDA did not and cannot prove that the FAAAA preempts prong 2 due to its impact on Xpressman's prices.

40

1.    **Section 148B Triggers Only M.G.L. Chapters 149 and 151, Not Every Conceivable Federal and State Employment Statute.**

**Federal Laws**.  MDA claimed, and the district court included in its assessment of prong 2's impact on Xpressman's prices, that compliance with prong 2 would cost Xpressman $[] for Social Security, $[] for Medicare, and $[] for unemployment.  A. 183/292, SMF 34 (unsealed/sealed).  The district court also adopted MDA's claim that Xpressman would have to offer all of its drivers health insurance under the Affordable Care Act at an annual cost of $382,336.  A. 182, SMF 31.  This was error.

First, section 148B's definition of employee does not trigger the application of *any* federal laws—let alone the four the district court relied on—because each has its own definition, refined by case law, of when a worker is an "employee." *See* 26 U.S.C. § 3121(d)(2) (FICA, governing Social Security and Medicare Tax contributions); *id*. § 3306(i) (FUTA); *id*. § 4980H(c)(4)(a) (ACA).[24]

Second, concluding, as the district court did, that being deemed an employee under prong 2 "increase[s] the likelihood of meeting the 'employee' definition" that controls other statutes, takes the "relate to" analysis too far.  Prong 2 is not a dispositive part of the definitions of "employee" in any of those other statutes

---

[24]    Under FICA, "employee" is generally defined using "the usual common law rules[.]"  *Id*. § 3121(d)(2).  This definition is incorporated in FUTA, *id*. § 3306(i).

MDA cites.  If a worker meets one of those other definitions, and the resulting application of that statute "significantly impacts" prices, routes, or services, then MDA may challenge that statute as preempted.  But prong 2's relationship to those impacts would be at best "tenuous, remote, or peripheral."  *See Dan's City*, 133 S. Ct. at 1778 ("the breadth of the words 'related to' does not mean the sky is the limit").

Third, the district court wrongly ruled that employers cannot treat workers as employees under some statutes and independent contractors under others.  MDA made no evidentiary showing that Xpressman's couriers would actually be deemed independent contractors under any of the other statutes.[25]  Even if it had, MDA's claim that the arrangement is unworkable is entirely speculative, because a worker may simultaneously be an independent contractor under one law and an employee under another.  *See Gennell v. Fedex Ground Package System, Inc.*, 2013 WL 4854362, *1 (D. N.H. 2013) (drivers independent contractors under common law and employees under certain state laws); *Sebago v. Boston Cab Dispatch, Inc.*, 471 Mass. 321, 328, 28 N.E.3d 1139, 1146 (2015) (employee under section 148B,

---

[25]     Indeed, the Attorney General had earlier offered evidence that the couriers would meet the "control" test for employee status.  Xpressman controlled how its Bank Route Drivers made deliveries, document and executive deliveries, identified themselves , and secured packages.  *See* Aff. of Jocelyn B. Jones, Supporting Attorney General's Cross-Motion for Summary Judgment, Doc. No. 83-1, p. 2 & Exh. 1.

while independent contractor under workers' compensation law); *Athol Daily News v. Bd. of Review of Div. of Emp't & Training*, 439 Mass. 171, 177 n.10, 786 N.E.2d 365, 371 n.10 (2003) (worker may be an independent contractor under common law and an employee for unemployment insurance purposes); *Boston Bicycle Couriers, Inc. v. Deputy Dir. of the Div. of Employment & Training*, 56 Mass. App. Ct. 473, 477, 778 N.E.2d 964, 967 (2002) (same).

**State Laws Not Triggered by Section 148B**.  The district court also inappropriately included costs associated with state income-tax withholding and workers' compensation laws (chapters 62B and 152, respectively) in its assessment of impact.  A. 184, SMF 36, Resp. 36.  Section 148B does not trigger those laws.[26] Each uses its own separate definition of employee to determine coverage, and it was error for the district court to consider the claimed costs of complying with those laws in determining prong 2's impact.

---

[26]    Putting to rest a disagreement noted in *MDA*, 769 F.3d at 15 n.1, the Supreme Judicial Court recently clarified that section 148B triggers only chapters 149 and 151; other definitions of "employee" control for the purposes of triggering payroll tax withholding and workers compensation coverage under chapters 62B and 152.  *Sebago*, 471 Mass. at 337-38 & nn.12-14, 28 N.E.3d at 1153-54 & nn.12-14.  Although section 148B(d) establishes a remedy extending to failure to withhold taxes or provide workers compensation coverage, the remedy applies only where an employer both misclassifies employees under section 148B "and in so doing fails to comply" with chapters 62B or 152, which do not apply unless their separate definitions of "employee" are satisfied.

### 2.    Section 148B Does Not Request Motor Carriers to Comply with "Industry Standards"

The district court erred in considering the costs of Xpressman purchasing a fleet of vehicles, pursuant to "industry standards" calling for employee-couriers to drive company-owned vehicles.  A. 227.  Because an employer's compliance with industry standards is voluntary (and not triggered by prong 2), the costs associated with it cannot cause FAAAA preemption.  *See Wolens,* 513 U.S. at 228 (ADA does not protect airline from costs of "its own, self-imposed undertakings"); *Overka*, 790 F.3d at 39 (same).  Massachusetts law does not require employers to furnish vehicles, or prohibit employees from using their own vehicles for their employer's benefit if they are reimbursed for the resulting costs.  *See* A. 178, Resp. 20-21.

Similarly, the district court erroneously factored in Xpressman's hypothetical contributions to 401(k) plans (totaling $[] if offered to all employee-couriers).[27]  As the court itself acknowledged, "federal law does not require employers to provide retirement plans pursuant to 26 U.S.C. § 401(k)."  A. 183, SMF 33, Resp. 33; A. 234-235.

---

[27]    Besides challenging MDA's assertion that section 148B triggered any 401(k) requirements, the Attorney General disputed (for the purposes of opposing MDA's cross-motion, as explained in Section IV, *infra*), MDA's methodology for calculating the total contribution amount, as it was based on gross-disbursements to couriers, and not just their projected wages.  A. 183/292, Resp. 33.

**3.    The District Court Overstated the Impact of Obligations Triggered by Section 148B.**

Section 148B does trigger the Commonwealth's overtime pay and minimum wage laws.  But the district court significantly overstated the impacts either law would have on Xpressman.

**Overtime Pay**.  The district court concluded that compliance with the overtime pay law, M.G.L. c. 151, § 1A, would increase the cost of routes driven by a single courier that take more than 40 hours per week.  A. 232-233.  It then erroneously concluded that this increase in labor costs equated to an impact on Xpressman's prices.  *Id*.

MDA's best record evidence is the equivocal statement that some couriers "may" drive more than 40 hours per week to make deliveries. A. 145, ¶ 3.  MDA, however, offered no evidence that Xpressman's drivers *actually* drove more than 40 hours per week, so as to be entitled to overtime pay.  Nor did it offer evidence that Xpressman *needed* any particular courier to drive more than 40 hours per week to offer any particular prices, routes, or services the market demanded.  Thus, there is no record evidence to support that the overtime statute would increase Xpressman's labor costs.

45

Even if there were such evidence, labor costs are not prices.[28]  As addressed

above, it is well-established that an increase in labor costs, which in turn may

indirectly raise carrier prices, is typically insufficient to trigger "relate to"

preemption.  *See DiFiore*, 646 F.3d at 87; *S.C. Johnson*, 697 F.3d at 558; *Dilts*,

769 F.3d at 647-49; *Mendonca*, 152 F.3d at 1189; *Amerijet*, __ Fed. Appx. __,

2015 WL 5515343, *5.[29]  The FAAAA's legislative history confirms that Congress

did not (1) intend to immunize motor carriers from all state regulation that might

have economic effects or (2) view the variation among state labor regulations as

part of the objectionable patchwork of anti-competitive "economic regulation."

Conf. Rep. at 86, 88; *see also supra* Part I.A.

---

[28]    This Court has recognized precisely this distinction in the ERISA context.
*See Combined Mgt. v. Superintendent of Bur. of Ins.*, 22 F.3d 1, 7 (1st Cir. 1994).
There, it explained: "Clearly, any law that increases a company's cost of doing
business can be said to affect that business's ability to provide benefits under its
welfare benefit plan.  This is not the same, however, as imposing burdens on the
welfare benefit plan itself.  The increased cost or administrative burdens imposed
by the state law must have some connection to the covered ERISA plan before the
preemption analysis can come into play."  *Id.*

[29]    *See also Calop Bus. Sys., Inc. v. City of Los Angeles*, 614 Fed. Appx. 867,
870 (9th Cir. 2015) (ADA does not preempt city's living wage ordinance); *Filo
Foods, LLC v. City of SeaTac*, 357 P.3d 1040, 1057-1058 (Wash. 2015) (ADA
does not preempt city's minimum wage ordinance, which only "regulates
employer-employee relationships and its effect on airline prices and services is
only indirect and tenuous"); *PAC Anchor*, 329 P.3d  at 180-90 (FAAAA does not
preempt truck-driver misclassification claims seeking minimum wages,
unemployment insurance, workers' compensation, and expense reimbursements).

Given all this, the district court erred in ruling that any increase to Xpressman's labor costs as a result of the overtime law would significantly impact Xpressman's prices and trigger "relate to" preemption. *Travelers,* 514 U.S. at 668.

**Minimum Wage**.  If prong 2 required Xpressman to classify drivers as employees, Xpressman would have to comply with the $9/hour minimum wage. M.G.L. c. 151, § 1.  But MDA's expert assumed that treating drivers as employees would result in having to pay $14.50/hour, "based upon the US Bureau of Labor Statistics median pay for Couriers and Messengers[.]"  A. 73.  The expert apparently concluded that Xpressman would have to pay that higher wage to attract enough qualified drivers.  Where the market requires paying $14.50/hour, the law's $9/hour floor has no effect on Xpressman's labor costs, let alone its prices.

Even if the minimum wage law affected Xpressman's prices, that should not trigger preemption.  *See DiFiore*, 646 F.3d at 87; *S.C. Johnson*, 697 F.3d at 558; *Mendonca*, 152 F.3d at 1189; *Amerijet*, __ Fed. Appx. at __, 2015 WL 5515343, *5.  In enacting the FAAAA, Congress' recognition of the ten jurisdictions that did not regulate carriers' "intrastate prices, routes and services" (and thus were not part of the problem Congress meant preemption to solve) included eight with minimum wage laws and seven with prevailing-wage laws, a fact that the Ninth Circuit found

47

"revealing" in rejecting an FAAAA preemption challenge to the prevailing wage law in *Mendonca*.[30]  152 F.3d at 1187-88 & n.3.

Still, the district court determined that the "expense of tracking each employee's hours to ensure compliance with the minimum wage law" (as required by M.G.L. c. 151, § 15), impermissibly impacted Xpressman's prices.  A. 232. The district court failed to explain how performing the simple wage calculation in 454 C.M.R. 27.02 (total pay divided by hours worked) to ensure that payment of employees at least averaged the minimum wage created any expense for Xpressman or caused a significant impact on Xpressman's prices.   The recordkeeping involved would at most cause Xpressman a very slight increase in labor costs—insufficient, as explained above, to cause preemption.

### 4.    MDA Cannot Establish an Impact on Xpressman's Prices Based on the Other Statutes It Cited Below.

MDA relied on a host of other statutes below, none of which the district court recognized as impacting Xpressman's prices.  MDA's complaints about the

---

[30]    The Supreme Court has twice followed this same approach—examining state laws existing at the time a preemption clause was enacted—in rejecting ERISA-preemption claims, including one involving a prevailing-wage law. *Travelers,* 514 U.S. at 664-65; *Dillingham*, 519 U.S. at 330-31 & n.7, 334 (prevailing wage law).  The Court did not find similar legislative history convincing in *Rowe*, 552 U.S. at 374, but there the state law, although assertedly motivated by health concerns, expressly referred to and regulated use of motor-carrier "delivery services."  *Id*. at 368.

costs attributable to such laws necessarily fail, because each of those laws uses

another, separate definition of "employee." This is so for laws pertaining to

unemployment compensation,[31] employment discrimination,[32] and other forms[33] of

leave, as well as the now-repealed "fair share contribution" law.[34] Those statutes

do not use section 148B's definition of employee; whatever costs they might

impose on Xpressman are not attributable to section 148B.[35]

---

[31]    M.G.L. c 151A, § 2, includes its own three-part definition of "employee" containing a "Prong B" markedly different from section 148B.

[32]    Under M.G.L. c. 151B, "employee" is construed in accordance with common law. *Comey v. Hill*, 387 Mass. 11, 15, 438 N.E.2d 811, 814 (1982). M.G.L. c. 151B, § 4(9½) (restricting criminal record inquiries on employment applications) is subject to the same construction.

[33]    M.G.L. c. 149, § 52D(a) ("small necessities" leave), adopts the federal FMLA's definitions.

[34]    Under M.G.L. c. 149, § 188 (repealed, Mass. St. 2013, c. 39, §§ 108, 219 (eff. July 1, 2013)), which governed employer contributions to employee health insurance costs, the regulations construed "employee" and "employer" by referring to the unemployment and workers' compensation statutes, not to section 148B. *See* 956 C.M.R. 16.02.

[35]    MDA also cited M.G.L. c. 149, § 105D, which requires that certain employees, if they give sufficient advance notice, be allowed up to 8 weeks of *unpaid* parental leave. But MDA identified no specific "significant impact" that this law could have on prices, routes, or services, nor can any be identified as a logical matter. As explained *supra*, even some resulting increase in labor costs would not suffice to cause preemption.

Nor did the district court count the purported impacts on Xpressman's prices due to the costs of implementing various personnel policies and practices that MDA conceded were "not mandated by statute."  *See* MDA Mem. 7.  These included performance reviews; policies for conduct, discipline, attendance, hiring, and termination; and maintaining an employee handbook.  *Id*.  Because prong 2 does not require employers to adopt these practices, any related voluntarily-incurred costs have no bearing on whether prong 2 is preempted.

For all these reasons, MDA did not and cannot establish that prong 2 has a significant impact on Xpressman's prices.

### B.     MDA Did Not and Cannot Establish that Prong 2's Indirect Effects Amount to a "Significant Impact" on Xpressman's Routes.

The district court concluded there would be three potential impacts on Xpressman's routes if Xpressman's drivers were classified as employees.  A. 227-229.  The theorized impacts included altering certain routes to accommodate the unpaid meal break required by M.G.L. c. 149, § 100; paying for "stem miles"; and altering routes to comply with the Sunday work statute (M.G.L. c. 149, § 47).  *Id*.  The district court, however, had no basis for concluding that these claimed impacts significantly affected Xpressman's routes.

**Meal Break Law**.  The record evidence does not establish that the thirty-minute, unpaid meal break law required by M.G.L. c. 149, § 100, when an employee works more than six consecutive hours, has a significant impact on

50

Xpressman's routes.  Review of the [] individual loops completed during the sample period selected by MDA's expert reveals that all but one ([]%) were six hours or less.  *See* A. 187/295, Resp. 45-46.  If anything, the district court should have concluded that the meal break law did not "meaningfully interfere with a motor carrier's ability to select its starting points, destinations, and routes" because all the record evidence established was that the law permitted a few drivers, on a small number of routes, to "briefly pull on and off the road during the course of travel" for an unpaid meal-break.  *See Dilts*, 769 F.3d at 647-49.

**"Stem Miles" and Vehicle Storage**.  The district court's assumption that compliance with prong 2 impacts Xpressman's routes by compelling Xpressman to store vehicles at its facility and change where routes start and finish is wrong as a matter of law.[36]  A. 228.  Section 148B neither mandates nor has any logical bearing on where a motor carrier stores its vehicles.  Under Massachusetts law, ordinary commuting time is not compensable, even when an employee is using an employer-supplied vehicle.  A. 178-179, Resp. No. 21-22; A. 197, ¶ 9.  Massachusetts law also permits employers to assign employees to report to work at

---

[36]    MDA claimed that company-owned vehicles must be stored on company premises (A. 178, SMF 21), increasing miles driven by 28% and hours worked by 15%.  A. 1179, SMF 22.  The Attorney General disputed these amounts.  A. 178-179, Resp. 21-22.   But because MDA is wrong as matter of law on the company-premises storage requirement, the dispute about the costs of such storage did not preclude summary judgment for the Attorney General.

a location other than their employer's place of business, meaning that an employee-driver, just like Xpressman's existing drivers, could begin and end her paid work day where Xpressman's routes start or finish. A. 179, Resp. No. 22; A. 197, ¶ 9. Thus, the district court erred as a matter of law in considering stem miles (and the associated claimed increase in labor costs) as part of the impact on Xpressman's routes.

**Sunday Work Statute**. The district court erred in concluding that compliance with the Sunday work statute—M.G.L. c. 149, § 47, mandating that an employer who requires an employee to work on Sunday afford the employee one day off during the ensuing six days—would impact Xpressman's routes. A. 228-229. MDA did not establish that it needs any individual courier who delivers on Sundays to drive the next six days in a row to service Xpressman's routes. All MDA established was that Xpressman has some drivers, currently classified as independent contractors, who "choose" to work seven days in a row. A. 145, ¶ 5. Because the Sunday work statute allows employees to do just that "at the[ir] request," M.G.L. c. 149, § 47, it would have no impact on Xpressman's current practices. Finally, even if the statute mandated one day's rest in seven without this exception, the result for Xpressman, again, would be at most some increase in labor costs to cover the routes when their regular drivers are unavailable, which does not cause preemption. MDA's argument also "conflates the requirements for

52

individuals drivers with requirements imposed on motor carriers." *Dilts*, 769 F.3d

at 649.  Xpressman remains free to schedule deliveries as frequently as it desires,

at the times it chooses, and still comply with the law.  It simply must take courier

work-load into account when scheduling.  *Id.*

> For these reasons, MDA did not and cannot prove that compliance with

prong 2 will have a significant impact on Xpressman's routes.

### C.    MDA Did Not and Cannot Establish that Prong 2's Indirect Effects Amount to a "Significant Impact" on Xpressman's Services.

> The district court erroneously determined that if prong 2 required same-day

delivery companies to hire employees, then the Massachusetts "on-call" wage

regulation would compel Xpressman to cancel its "on-demand" delivery services.

A. 229-230.  All the regulation requires is that employees be paid for on-call time

"unless the employee is not required to be at the work site or another location, and

is effectively free to use his or her time for his or her own purposes."  *See* 454

C.M.R. § 27.04(2) (formerly 455 C.M.R. § 2.03(2)); A. 197, ¶¶ 8-9.  But

Xpressman says its existing on-demand delivery model allows its drivers these

exact freedoms.  A. 60, ¶ 32 ("on demand couriers can and do make deliveries for

other delivery service companies while waiting for a job from Xpressman, or even

while en route to a pick-up or drop-off for Xpressman").  So treating those on-

demand drivers as employees would not require them to be paid for any "on-call

53

time," and thus would not affect the price or availability of on-demand service.[37]

Nor does the "reporting pay" regulation have the slightest effect on on-demand services, contrary to MDA's contention below.  *See* A. 186, SMF 44.  The "reporting pay" regulation is inapplicable to on-demand deliveries because it only applies to employees "scheduled to work three or more hours" who arrive for work at the scheduled time and are "not provided with the expected hours of work."  *See* 454 C.M.R. § 27.04(1) (formerly 455 C.M.R. § 2.03(1)); A. 161, Resp. 44 (citing A. 197, ¶¶ 7-8, 10).  Because Xpressman's on-demand services are "for unscheduled, rush deliveries," "variable and unpredictable," with Xpressman engaging couriers on an as-needed basis, the work is not *scheduled* and so no "reporting pay" is due.  A. 197, ¶¶ 7-8.  Thus the reporting-pay regulation has no impact on Xpressman's ability to offer on-demand services.

---

[37]     The district court's observation that an employee-driver might be unavailable for an on-demand delivery while driving for another company is off-the-mark, because the same is equally true for a current Xpressman driver.  A. 58, ¶ 18; A. 60, ¶ 32.  MDA cites no law—let alone one triggered by section 148B—that would prevent an employee-driver from delivering for other companies (or from working any other job) while awaiting an on-demand delivery job from Xpressman.

**D. Even if MDA Had Shown that Any Specific Law Has a Significant Impact on Xpressman's Prices, Routes, or Services, at Most MDA Would be Entitled to a Ruling that the Specific Law is Triggered by Prong 2, is Preempted.**

If this Court determines that the undisputed record evidence establishes some significant impact to Xpressman's prices, routes, or services, it "should 'not nullify more of a legislature's work than is necessary[.]'" *Rowe*, 448 F.3d at 80 (citation omitted); *see id.* at 80-82 (only one of statute's two provisions FAAAA-preempted). Instead, it should hold preempted only the particular law, insofar as it is triggered by prong 2, that MDA established has the forbidden significant impact. To hold prong 2 entirely preempted, as the district court did, was error, as it could free Xpressman and all of MDA's members from compliance with *every* labor-protection provision in chapters 149 and 151—including many they did not establish or even claim affected Xpressman's prices, routes, or services.

**IV. The District Court Erred in Granting MDA Summary Judgment.**

Even if this Court determines that the Attorney General was not entitled to summary judgment, it should still vacate the allowance of MDA's cross-motion. In addition to vastly overstating the impacts triggered by prong 2, *see* Section III, *supra*,[38] the district also erred by drawing all the inferences in MDA's favor and

---

[38]     For purposes of appealing the grant of MDA's cross-motion, the Attorney General incorporates by reference the arguments in Section III regarding the impacts triggered by prong 2.

considering claimed impacts based on material facts that the Attorney General disputed for purposes of opposing MDA's motion. Once the disputed facts, challenged inferences, and impacts not triggered by prong 2 are removed from consideration, the record evidence does not establish that the *undisputed* effects from the laws actually triggered by compliance with section 148B are sufficient as to "significantly impact" Xpressman's prices, routes, or services.

### A.    The District Court's Consideration of Disputed Facts.

The district court erred in granting MDA summary judgment when the Attorney General had established genuine issues of material fact. *Rockwood v. SKF USA, Inc.*, 687 F.3d 1, 9 (1st Cir. 2012).

Most importantly, among other such errors, the court simply disregarded the fact that the Attorney General disputed the accuracy of many of the subsidiary calculations underlying MDA's projected increase in labor costs. *See* A. 176-178, 181-184 (Resp. 17, 19, 28-31, 33-34, 36); *see also* AG Mem. 28-33. For example, the Attorney General disputed whether MDA was correct to assume that Xpressman would need to hire *all* 58 of its couriers *on a full-time basis* if they were classified as employees. *See* A. 177 (Resp. 19) (disputing total number considered in the estimate because MDA's own expert opined that 40% of Xpressman's drivers drove less than four hours per day). The Attorney General also disputed whether it would cost Xpressman *$3,000 per employee* (or $252,000,

56

in total, based on the 84 couriers Xpressman contracted with in 2011) to conduct

background and screening checks, when MDA's expert separately estimated it

would cost *$2,250 in total* to hire between 13 and 24 individuals.  *See* A. 181

(Resp. 28-29).  *See also* A. 177-178, 183-184 (additional disputes to input

calculations); AG Mem. 28-33 (discussing same).

Thus, even if this Court were inclined to hold as a matter of law that the

effect on Xpressman's labor costs *might*, if large enough, be sufficient to rise to the

level of a significant impact, the Attorney General sufficiently put the *degree* of

the claimed monetary impact into dispute to preclude summary judgment for

MDA.

### B.    The District Court's Improper Inferences.

The district court compounded the error by making impermissible inferences

in MDA's favor from the disputed facts.  *See Bower*, 731 F.3d at 92.  In one

instance, the Attorney General disputed whether Xpressman offers to pay couriers

by the hour, and not just by the route as MDA claimed.  *See* A. 151, Resp. 13

(citing A. 190, ¶ 6 & A. 376-384 (showing compensation by the hour)).  Ignoring

this factual dispute, the district court inferred that the "expense of tracking each

employee's hours to ensure compliance with the minimum wage law" (as required

by M.G.L. c. 151, § 15) impermissibly affected Xpressman's prices because

Xpressman currently "compensates its couriers by the route."  *Id.*

57

In another instance, the district court inferred from the record evidence that offering a meal-break would significantly impact Xpressman's routes. A. 228. But as explained in Section III.B., *supra*, that inference was not supported by the record evidence, *see* A. 186-187, Resp. 45-46, and, in any event, certainly should not have been drawn against the Attorney General when considering MDA's summary judgment motion. *Bower*, 731 F.3d at 92 (requiring inferences be drawn in the nonmovant's favor).

For these reasons, MDA's motion for summary judgment should have been denied.

## CONCLUSION

For the foregoing reasons, this Court should vacate the summary judgment for MDA and order judgment declaring that prong 2 is not FAAAA-preempted.

Respectfully submitted,


MAURA HEALEY,

Attorney General of Massachusetts

  /s/ Douglas S. Martland
Douglas S. Martland (1st Cir. No. 1137738)
Assistant Attorney General
One Ashburton Place, Boston, MA  02108
(617) 963-2062
douglas.martland@state.ma.us

58

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

1.     This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,958 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman style, 14-point font.

/s/Douglas S. Martland
Douglas S. Martland (1st Cir. No. 1137738)
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2015, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system.  I further hereby certify that on November 20, 2015, I delivered by first class mail, postage prepaid, a copy of the within documents to the following counsel of record who is not registered as an ECF Filer and will not be served by the CM/ECF system:

David C. Casey
Christopher B. Kaczmarek
Stephen T. Melnick
Carie A. Torrence
Walter Hunter
Littler Mendelson, P.C.
One International Place, Suite 2700
Boston, MA  02110

Harold L. Lichten
Shannon Liss-Riordan
Lichten & Liss-Riordan PC
100 Cambridge St., 20th Floor
Boston, MA 02114

/s/Douglas S. Martland
Douglas S. Martland (1st Cir. No. 1137738)
Assistant Attorney General

## **ADDENDUM**

Memorandum and Order of July 8, 2015.................................... A-001

49 U.S.C.A. § 14501 .................................................................. A-020

M.G.L.A. 149 § 148B ................................................................ A-024

H.R. Conf. Rep. 103-677,
        reprinted in 1994 U.S.C.C.A.N.1715 (1994).................... A-026

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                       )
                                       )
MASSACHUSETTS DELIVERY                 )
ASSOCIATION,                           )
                                       )
              Plaintiff,               )
                                       )
       v.                              )        Civ. Action No. 10-cv-11521
                                       )
                                       )
MAURA HEALEY, IN HER OFFICIAL          )
CAPACITY AS ATTORNEY GENERAL           )
OF THE COMMONWEALTH,                   )
                                       )
              Defendant.               )
                                       )
_____)
```

## MEMORANDUM AND ORDER

**CASPER, J.**                                                **July 8, 2015**

## I.      Introduction

Plaintiff Massachusetts Delivery Association ("MDA") has filed this lawsuit against

Defendant Maura Healey,[1] in her official capacity as Attorney General of the Commonwealth of

Massachusetts (the "Attorney General"), seeking a declaration that the "B prong" of the

Massachusetts Independent Contractor Law, Mass. Gen. L. c. 149, § 148B(a)(2), is preempted by

the Federal Aviation Administration Act of 1994 ("FAAAA"), 49 U.S.C. § 14501, and for an

injunction barring the Attorney General from enforcing Section 148B against MDA's members.

D. 22.  Both MDA and the Attorney General have moved for summary judgment.  D. 156

(MDA's renewed motion for summary judgment); D. 174 (renewing the Attorney General's

---

[1] MDA originally filed this lawsuit against Martha Coakley in her official capacity at the
time as the Attorney General of the Commonwealth of Massachusetts.

1

prior cross motion, D. 82).  For the reasons stated below, the Court ALLOWS MDA's motion and DENIES the Attorney General's motion.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor."  Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010).  "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'"  Id. (quoting Anderson, 477 U.S. at 249) (alteration in original).  The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.   Factual Background

This factual summary recounts the undisputed material facts.   MDA is a trade organization representing entities engaged in the business of same-day delivery service.  D. 73 ¶ 1 (MDA's statement of undisputed material facts); D. 175 at 1 (Defendant's response to plaintiff's statement of undisputed material facts).  Most MDA members hire independent

contractors to provide delivery services.  Id.  One such MDA member, offered by MDA as an exemplar for the purpose of this suit, is X Pressman Trucking & Courier, Inc. ("Xpressman").  D. 73 ¶ 2; D. 175 at 2.  Xpressman provides both "scheduled route" and "on-demand" delivery services through independent contractors who utilize their own cars or trucks.  D. 73 ¶¶ 3-4; D. 175 at 2.  Scheduled route service requires package pick-up and delivery at scheduled times and locations.  D. 73 ¶ 5; D. 175 at 2.  Xpressman has approximately 100 scheduled routes operated by 46 couriers.  D. 73 ¶ 6; D. 175 at 3.  On-demand service, on the other hand, is variable.  D. 73 ¶ 7; D. 175 at 3.  Xpressman fields requests from its clients for unscheduled, rush deliveries.  Id.  Couriers who provide on-demand service contact Xpressman each day to indicate their availability.  D. 73 ¶ 8; D. 175 at 3.  Xpressman then matches its clients' requests with the couriers' stated availability.  Id.  Xpressman contracts with twelve on-demand couriers, but only seven make twenty on-demand deliveries on an average day.  D. 73 ¶ 9; D. 175 at 3.

As of October 2012, Xpressman employed six full-time and two part-time employees who performed administrative and warehouse duties.  D. 73 ¶ 10; D. 175 at 4.  They were paid a salary or hourly wage and received health insurance and 401(k) plan benefits (including a four percent contribution match by Xpressman).  D. 73 ¶ 11; D. 175 at 4.  For these employees, Xpressman also provided workers' compensation insurance, paid payroll taxes and contributed to unemployment insurance.  Id.  By contrast, Xpressman's independent contractor couriers are paid by route and do not receive benefits such as health insurance or 401(k) benefits.  D. 73 ¶ 13; D. 175 at 5.  Xpressman also does not provide workers' compensation, pay payroll taxes or contribute to unemployment insurance for its independent contractors.  Id.

## IV.    Procedural History

MDA instituted this action on September 7, 2010.  D. 1.  The Court allowed the Attorney General's motion to dismiss on the basis of abstention pursuant to <u>Younger v. Harris</u>, 401 U.S. 37 (1971).    D. 9, 37.    The First Circuit reversed and remanded.    <u>Mass. Delivery Ass'n v. Coakley</u>, 671 F.3d 33 (1st Cir. 2012) ("<u>MDA I</u>").  MDA then moved for summary judgment and the Attorney General cross-moved for summary judgment.  D. 67, 82.  The Court denied MDA's motion and allowed the Attorney General's motion in part, holding that the FAAAA did not preempt Section 148B.  D. 123.  Upon  appeal, the First Circuit reversed, holding that Section 148B "clearly concerns a motor carrier's 'transportation of property'" and directing the Court to "determine . . . whether Section 148B satisfies the broad preemption test based on a review of the full record."  <u>Mass. Delivery Ass'n v. Coakley</u>, 769 F.3d 11, 23 (1st Cir. 2014) ("<u>MDA II</u>").  In doing so, the First Circuit "express[ed] no view on the sufficiency of the evidence before the district court."  <u>Id.</u> at 22.

MDA now renews its motion for summary judgment, D. 156, and the Attorney General renews her cross-motion for summary judgment, D. 174.  The Court heard the parties on the pending motions and took these matters under advisement.  D. 181.

## V.    Discussion

### A.    The Statutes at Issue and Prior Cases

The FAAAA expressly preempts certain state laws pertaining to motor carriers, stating that "a State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."  49 U.S.C. § 14501(c)(1).  The First Circuit determined that Section 148B "clearly concerns a motor carrier's 'transportation of property.'"  <u>MDA II</u>, 769 F.3d at 23.  The Court also held that Section 148B "potentially impacts

4

the services the delivery company provides, the prices charged for the delivery of property, and the routes taken during this delivery." Id. As directed by the First Circuit, the issue before the Court is whether "this effect on delivery companies' prices, routes, and services rises to the requisite level for FAAAA preemption." Id.

Section 148B provides a three-pronged test to determine whether "an individual performing any service" is an independent contractor. The individual must be "free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact;" the service must be "performed outside the usual course of business of the employer;" and "the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed." Mass. Gen. L. c. 149, § 148B(a). At issue here is the second of these requirements, the so-called "B prong," because couriers hired to provide delivery services are without exception performing within the usual course of business of the delivery companies.

"The Supreme Court has instructed that the 'related to' language . . . is meant to be construed broadly, consistent with Congress's intention that . . . preemption should have an expansive reach." Tobin v. Fed. Express Corp., 775 F.3d 448, 454 (1st Cir. 2014) (addressing breadth of preemption under the Airline Deregulation Act). "The phrase 'related to' . . . embraces state laws 'having a connection with or reference to' carrier 'rates, routes or services,' whether directly or indirectly." MDA II, 769 F.3d at 17 (quoting Dan's City Used Cars, Inc. v. Pelkey, 133 S. Ct. 1769, 1778 (2013)). "Under this rubric, a state statute is preempted if it expressly references, or has a significant impact on, carriers' prices, routes, or services." Id. at 17-18. The First Circuit characterizes this "related to" test as "purposely expansive" and "sweeping," id. at 18, but not as limitless. "State laws whose effect is only 'tenuous, remote, or

peripheral' are not preempted." Id. (quoting Morales v. Trans World Airlines, Inc., 504 U.S. 374, 390 (1992)). Neither the Supreme Court nor the First Circuit has expressed a view as to "where it would be appropriate to draw the line" between an impact that is "significant" as opposed to "tenuous, remote, or peripheral." Morales, 504 U.S. at 390 (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 100 n.21 (1983)); see Nationwide Freight Sys., Inc. v. Ill. Commerce Comm'n, No. 13-3316, 2015 WL 1840568, at * 8 (7th Cir. Apr. 23, 2015) (noting that "the Supreme Court has not yet had occasion to identify precisely what types of effects will be too insignificant to trigger preemption, because the cases that the Court has decided . . . have not been close to the line, whatever the line may be"); DiFiore v. Am. Airlines, Inc., 646 F.3d 81, 86 (1st Cir. 2011). A state law, however, "may be preempted even if it is indirectly or generally applicable." MDA II, 769 F.3d at 20 (quoting Bower v. Egypt Airlines Co., 731 F.3d 85, 95 (1st Cir. 2013)).

The First Circuit instructs this Court to "engage with the real and logical effects of the state statute" in its determination of whether Section 148B "has a forbidden significant effect on even one motor carrier." Id. at 20, 21. Even the "'potential' impact on carriers' prices, routes, and services can be sufficient if it is significant, rather than tenuous, remote or peripheral." Id. at 21. "[E]mpirical evidence is [not] necessary to warrant FAAAA preemption" if the "logical effect that a particular scheme has on the delivery of services or setting of rates" is "sufficient even if indirect." Id. "[W]e are following Congress's directive to immunize motor carriers from state regulations that threaten to unravel Congress's purposeful deregulation in this area." Id.

The goal of the FAAAA is to "creat[e] an environment in which '[s]ervice options will be dictated by the marketplace,' and not by state regulatory regimes." N.H. Motor Trans. Ass'n. v. Rowe, 448 F.3d 66, 80 (1st Cir. 2006), aff'd, 552 U.S. 364 (2008) (quoting H.R. Conf. Rep. 103-

677 at 88).  Congress sought to "ensure transportation rates, routes, and services that reflect 'maximum reliance on competitive market forces,' thereby stimulating 'efficiency, innovation, and low prices,' as well as 'variety' and 'quality.'"  Rowe v. N.H. Motor Trans. Ass'n., 552 U.S. 364, 371 (2008) (quoting  Morales, 504 U.S. at 378).

**B.     Section 148B is Preempted by the FAAA**

The First Circuit has held that empirical evidence is not required to demonstrate FAAAA preemption, MDA II, 769 F.3d at 21 (citing Rowe, 448 F.3d at 82 n.14), a holding it recently reaffirmed.  Overka v. American Airlines, Inc., No. 14-1869, 2015 WL 3635328, at * 4-5 (1st Cir. June 12, 2015) (rejecting "a categorical rule" that there must be "a record on the effect [of the challenged scheme] on . . . prices or services").  Instead, courts may examine "'the logical effect that a particular scheme has on the delivery of services or the setting of rates.'"  MDA II, 769 F.3d at 21 (quoting Rowe, 448 F.3d at 82 n. 14); accord, Overka, 2015 WL 3635328, at * 5.  This "logical effect can be sufficient even if indirect" so long as it is "significant, rather than tenuous, remote, or peripheral."  MDA II, 769 F.3d at 21.  With these dictates in mind, the Court turns to the record as it bears on the logical effect of Section 148B on routes, services and prices.

*1.     Effect on Xpressman's routes*

Several changes resulting from the application of Section 148B would require Xpressman to modify the delivery routes it serves, i.e., if Xpressman's independent contractors were now classified as employees.  One example provided by MDA is that, while independent contractors use their own vehicles, industry standard calls for employees to drive company-owned cars.  D. 158 at 8; D. 73 ¶¶ 20-21; D. 175 at 7 (not disputing industry standard but asserting that employees may use their own cars if they are reimbursed for vehicle operating costs).  The use of delivery vehicles owned by Xpressman, instead of being owned by its independent contractors,

has the potential to require Xpressman to change its routes. Even as the Attorney General posits that "[i]t is viable" for employees to use company-owned vehicles for personal transportation, D. 175 at 7, this contention does not address the potential effect on routes that MDA has shown. If, in keeping with the industry standard, Xpressman provided company cars for its couriers, this would require the delivery company to incur the expense of acquiring and maintaining a fleet of delivery vehicles and to incorporate "stem miles" into each courier's route – the miles driven between the delivery company's location and the first and last route stops. D. 73 ¶ 22; D. 175 at 7 (noting that "stem miles" are not required by Section 148B). Xpressman calculates that the additional stem miles would increase miles driven by 28 percent and hours worked and paid by 15 percent. D. 73 ¶ 22; D. 175 at 6-8 (disputing assumed wage rate). Such a practice, the logical effect of Section 148B on Xpressman's routes, would at least force a delivery company to charge higher prices that allow it to recoup these costs and to alter routes that formerly would begin and end at the courier's own residence.

Further, Section 148B's effect on routes is implicated by the meal break provision of Chapter 149. A thirty-minute, unpaid meal break must be offered to any person required to work more than six hours per day. Mass. Gen. L. c. 149, § 100. Xpressman contends that its routes requiring more than six consecutive hours of driving would have to be modified. D. 158 at 3, 20; D. 73 ¶ 46; D. 175 at 16 (responding that many, but not all, routes do not require more than six hours of driving or have a thirty minute break built into the route). The Attorney General's argument that it would not be difficult for Xpressman to find drivers willing to forego the meal break is unavailing. D. 174 at 22. A delivery company cannot be forced to conduct its business in reliance upon finding workers willing to waive their statutorily provided entitlements. Similarly, the Attorney General's remedy for the Sunday work statute, which imposes sanctions

on an employer who requires an employee to work on Sunday unless the employee is afforded a day off during the ensuing six days, Mass. Gen. L. c. 149, § 47, is for Xpressman to find drivers who wish to work on Sundays and waive their right to their days off. D. 174 at 24. This solution cannot form the basis of a lasting business model. If compliance with Section 148B hinders the opportunity to provide daily delivery service without the contingency of adding drivers to a route or constricts a route to fewer than six hours of driving, now or in the future, then Section 148B impermissibly affects a delivery company's routes in a significant way.

2.      *Effect on Xpressman's services*

The First Circuit instructs that a service "represents a bargained-for or anticipated provision of labor from one party to another, thus leading to a concern with the contractual arrangement between the [carrier] and the user of the service." Tobin, 775 F.3d at 453 (internal quotation marks omitted). MDA asserts that Xpressman would have to abandon its "on-demand" delivery business if it were required to classify the couriers who provide that service as employees. D. 158 at 21; D. 73 ¶¶ 43-44; D. 175 at 15. Massachusetts regulations require that employees must be paid for time spent on call if the employee is not "effectively free to use his or her time for his or her own purposes." 455 C.M.R. § 2.03(2). Xpressman represents that providing on-demand courier services profitably depends upon the availability of a flexible workforce that does not need to be compensated while waiting for a job. D. 158 at 21. The Attorney General argues that the couriers, when not providing on-demand services, are free to use their time for their own purposes and nothing prevents the couriers from holding another job when not making deliveries for Xpressman. D. 174 at 20. Assuming that a courier does as the Attorney General suggests and secures a second job, however, that courier would then be unavailable to make an on-demand delivery for Xpressman during certain hours. At present,

9

when Xpressman receives a request for an on-demand delivery, it calls its independent contractors who may decline or accept each on-demand job offered to them.  D. 158 at 3; D. 177 at 9.  As employees, they would no longer have the option of declining a delivery.  D. 177 at 9.  They would be required to complete the delivery when requested, precluding them from working for another employer during the hours Xpressman requires them to be available.  Id. at 9-10.  If Xpressman is to satisfy requests for prompt, unscheduled deliveries, then it logically must retain employees who are on-call and who must be compensated for that time, which is different from its current business model.  Retaining on-call employees forces Xpressman to incur costs that translate into increased prices.  D. 73 ¶ 44; D. 175 at 15 (disputing that employees must be paid for being on call).  Conversely, if Xpressman endeavors to maintain its current prices, then the practical effect of Section 148B is to force it to abandon a service now demanded by the competitive marketplace.

"[W]hen a state law directly substitutes the state's own policies for competitive market forces, the state law produces precisely the effect the preemption clause seeks to avoid: 'a patchwork of state service-determining laws, rules and regulations.'" Tobin, 775 F.3d at 455 (quoting Rowe, 552 U.S. at 373) (concluding that plaintiff's claims would require defendant to perform certain services at the expense of alternative services, an effect that was not tenuous, remote or peripheral).  Similarly, here, Massachusetts seeks to enforce a policy of hiring employees when market forces have prompted delivery companies to adopt an independent contractor model.  The law would have the effect of limiting a courier company to the provision of scheduled service at the expense of on-demand deliveries.

Furthermore, to avoid increased costs, delivery companies would logically need to assign multiple delivery routes (those requiring only a couple of hours to complete, for instance) to one

employee.  See D. 174 at 32; D. 73-1 ¶ 20 (noting that some of Xpressman's routes take as little as two hours to complete and that eight couriers have routes that take fewer than four hours). Such a modification, however, affects the service offered by the delivery companies to clients. The routes of clients that require that their deliveries be completed early in the day could not be combined with routes of other clients who also require morning deliveries.  If delivery companies are forced to adjust the timing of each route, then, as in Tobin, the effect is not tenuous, remote or peripheral.  And, even if such balancing of route timing could be achieved with Xpressman's present client base, constant rebalancing would be required for Xpressman to remain responsive to its existing and new clients' needs because "the demands of the market could change at any time."  Tobin, 775 F.3d at 456.  "The purpose of [FAAAA] preemption is to enhance [delivery companies'] reliance on competitive market forces in order to shape their prices, routes, and services not at one particular moment in time but, rather, in response to the protean demands of the market."  Id.

### 3.   Effect on Xpressman's prices

The potential logical, if indirect, effect of Section 148B is to increase Xpressman's prices by increasing its costs.  There are myriad additional costs incurred by a delivery company that depends upon employees as opposed to independent contractors.  For example, the employer must pay payroll taxes, such as Social Security, Medicare and unemployment insurance.  D. 73 ¶ 34.  In addition, as discussed above, Xpressmen has proffered evidence that industry standards would require it to supply company vehicles to its drivers who currently use their own vehicles for deliveries, id. ¶ 20; D. 73-2 at 15, and thereby incur the expense of acquiring and maintaining a fleet of delivery vehicles.  As previously discussed, this arrangement also requires Xpressman's couriers to drive "stem miles."  D. 73-2 at 11, 15.  Alternatively, the delivery

company could forego investment in delivery vehicles and instead reimburse courier-employees for the miles they drive in their own cars.  D. 73-2 at 10-11; D. 175 at 7.  While saving "stem miles," this alternative again presents an increase in costs, in the form of vehicle mileage reimbursements, that is likely to have an effect on the prices charged by delivery companies.  D. 73-2 at 10-11; United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 323, 336 (1st Cir. 2003) (noting that statutory scheme that required UPS to obtain proof of recipient's payment of excise tax prior to package delivery "create[s] a substantial burden on UPS, in the form of additional labor, costs, and delays" and, therefore, the statutory scheme fell within the scope of FAAAA preemption).

Application of Section 148B also implicates the obligations imposed by Chapter 151.  Mass. Gen. L. c. 149, §148B(a) & (d).  Chapter 151 obligates employers to ensure that, no matter how employees are paid, they receive at least the minimum wage.  Mass. Gen. L. c. 151, § 1.  Here, Xpressman pays its couriers by the route. D. 73 ¶ 13.  Although Xpressman would not be required to compensate its employees by the hour, it would have to incur the expense of tracking each employee's hours to ensure compliance with the minimum wage law.  Mass. Gen. L. c. 151, § 15.  Moreover, Chapter 151 requires that employees receive time-and-a-half for any hours worked beyond a forty-hour work week.  Mass. Gen. L. c. 151, § 1A.  Any routes requiring more than forty weekly hours to complete, now or in the future, would require multiple employees to avoid the additional labor expense when only one independent contractor is required at present to service the route.  See D. 85-2 ¶ 3 (noting that couriers may drive more than 40 hours per week to make deliveries).  The implication is that the price charged for the route would increase due to the overtime pay Xpressman would owe to the courier dedicated to the route requiring in excess

of forty hours per week to complete.  Alternatively, to avoid incurring overtime costs, the route itself would have to be altered to accommodate the assignment of multiple couriers.

The Attorney General maintains that Section 148B does not mandate the application of other employment laws, namely Chapter 62B, the state income tax withholding laws, and Chapter 152, the workers' compensation laws, because each provides its own definition of "employee."[2]  D. 174 at 14-15.  Section 148B references Chapters 149 and 151, Mass. Gen. L. c. 149, § 148B(a) (applying definition of independent contractor to chapter 151) and (d) (imposing penalties for improper classification that also violates certain sections of chapter 149), but Chapters 62B and 152 each separately define "employee."  Mass. Gen. L. c. 62B, § 1 (defining "employee" in accordance with the Internal Revenue Code, 26 U.S.C. § 3401(c), except for certain full time students); Mass. Gen. L. C. 152, § 1(4) (defining "employee" as "every person in the service of another under any contract of hire, express or implied, oral or written" with certain exceptions).  While the Attorney General may be correct that enhanced remedies are available only if an individual is improperly classified under both Section 148B and either Chapter 62B or Chapter 152, Mass. Gen. L. c. 149, § 148B(d), the Attorney General interprets too narrowly the "forbidden significant effect" triggering a finding of preemption.  MDA II, 769 F.3d at 21.  That effect can be indirect, and the logical effect of classification as an employee under Section 148B, which specifically mentions both Chapters 62B and 152, is to increase the likelihood of meeting the "employee" definition provided in the latter statutes.  The Attorney General suggests a hybrid model where workers are considered to be employees under some statutes and to be independent contractors under others.  D. 174 at 26-27.  This notion imposes a

---

[2] In MDA II, the First Circuit noted the parties' dispute regarding the extent of the state statutes implicated by Section 148B.  769 F.3d at 15 n.1.  The First Circuit also reiterated that "[w]e previously noted that the classification was relevant to chapters 62B, 149, 151, and 152 of the Massachusetts General Laws."  Id. (citing MDA I, 671 F.3d at 36).

significant burden on employers who must determine how to classify each worker with respect to each statute. The Attorney General provides no examples of such an arrangement operating in practice.[3]

Chapter 62B would require Xpressman to withhold income tax on behalf of its employees, Mass. Gen. L. c. 62B, § 2, while Chapter 152 calls for employers to provide workers' compensation benefits, Mass. Gen. L. c. 152, § 25A. Without deciding whether Chapters 62B and 152 would be applicable to Xpressman's couriers should they be classified as employees under Section 148B, the Court observes that each statute imposes potential additional costs on an employer which are likely to be passed on to the consumer in the form of increased prices.

The Attorney General also insists that Section 148B does not trigger application of any federal statutes. D. 174 at 13. Again, the Attorney General improperly limits her analysis of the statutes triggered by Section 148B to only the explicit and narrow language of the statute. Although no federal statute is specifically named in Section 148B, the practical and significant, if indirect, effect of an employee classification under the law is to require adherence to a host of other laws. For example, under the Patient Protection and Affordable Care Act (the "ACA"), some employers are required to offer health insurance to eligible employees who work thirty or more hours each week. See 26 U.S.C. § 4980H. In addition, while federal law does not require

---

[3] The Supreme Judicial Court's recent decision in Sebago v. Boston Cab Dispatch, Inc., 471 Mass. 321, 322-23 (2015), in which the court held that licensed taxicab drivers could be classified as independent contractors in accordance with Section 148B and the regulations governing the Boston taxicab industry, does not dictate another conclusion here. The Attorney General asserts that the case shows that employment status under Section 148B does not trigger laws pertaining to workers' compensation, unemployment insurance and payroll taxes. D. 184 at 1. Those statutes and the interpretations of them, however, make it clear that taxicab drivers are excluded. Sebago, 371 Mass. at 337-38 n.12 (citing Mass. Gen. L. c. 152, § 1(4)), n.13 (citing Commissioner of the Div. of Unemployment Assistance v. Town Taxi of Cape Cod, 68 Mass. App. Ct. 426, 430-32 (2007)), n.14 (citing Rev. Rul. 71-572). No analogous explicit guidance regarding how couriers would be construed under the relevant statutes exists here. Moreover, Sebago did not address or settle the question of preemption before this Court.

employers to provide retirement plans pursuant to 26 U.S.C. § 401(k), delivery companies such as Xpressman that already offer such plans (to its eight employees) are likely to continue to offer them, especially where the provision of valuable fringe benefits aids in the recruitment of a quality workforce.  Although incurring the cost of matching employees' contributions to a 401(k) plan is voluntary, it is reasonable to expect delivery companies to incur the expense in a competitive marketplace and, therefore, is properly considered a logical, indirect effect of the Section 148B classification.

MDA has submitted evidence quantifying the extent of the increase in costs Xpressman would incur if its independent contractors had to be converted to employees.  D. 73-2; D. 73-3; D. 158 at 9; D. 180.  The Attorney General responds that MDA "greatly exaggerates" and "double-counts" these costs, D. 174 at 32, creating an issue of material fact that precludes summary judgment.  Id. at 32-37.  Specifically, the Attorney General contends that Xpressman overstates the number of couriers it would need to hire to service its business and their wage rate, id. at 32-33; the costs of employee benefits and other employee-related expenses, such as workers' compensation, social security and Medicare, id. at 33-34, 35-37; and the costs of recruiting and hiring its workforce, id. at 34-35.  Even crediting the Attorney General's objections to Xpressman's calculations, the Attorney General does not argue that there would be no increase in Xpressman's costs.  To the contrary, the Attorney General concedes that there would be a cost increase, just that it would be less than the increase asserted by MDA, and thus not significant enough to warrant a finding of preemption.  D. 174 at 31, 34.  Using the Attorney General's own assumptions, however, the cost increase that would face Xpressman should its couriers be deemed employees is, at a minimum, more than negligible, and logically would

translate into higher prices charged to Xpressman's customers.  D. 180 at 3.  Such an effect is more that tenuous, remote or peripheral.

Moreover, much of the Attorney General's dispute about the effect on routes, services and prices focuses on the necessary impact of Section 148B, based on the statutory text, rather than on the potential or indirect impact of classification as an independent contractor.  See, e.g., D. 175 at response 17 (provision of fringe benefits and mileage compensation not imposed by Section 148B); response 19 (Section 148B requires paying minimum wage, not industry standard wage rate); response 22 (stem miles not required by Section 148B); response 30 (health insurance costs not imposed by Section 148B); response 33 (401(k) benefits not required by Section 148B).  Even where implicated industry standards or statutes would result in changes to routes, services or prices, the Attorney General argues that Xpressman can simply make other choices in how it operates its business.  See, e.g., id. at response 20 (employers may require employees to use their own cars so long as employees are compensated for the mileage driven); response 21 (employers may permit employees to use company owned cars for personal transportation); response 46 (law allows for employees to waive statutory meal break).  MDA II, however, instructs that the "related to" test is "purposefully expansive."  769 F.3d at 18.  "Potential" impact on routes, services and prices is sufficient so long at is "significant, rather than tenuous, remote and peripheral."  Id. at 21.  Indeed, the First Circuit stated that Section 148B "potentially impacts the services the delivery company provides, the prices charged for the delivery of property, and the routes taken during this delivery."  Id. at 23.  The inquiry required to be made by the Court is not limited to the narrow requirements explicitly imposed by Section 148B, but instead must look to the potential and logical impact of the statute, even if that impact is indirect.  Xpressman is not required to deviate from industry standards or to devise detours

around statutory strictures invoked by Section 148B to avoid that impact.  To do so would allow state regulation to "threaten to unravel Congress's purposeful deregulation in this area."  Id. at 21.

Applying First Circuit and Supreme Court precedent, the Court concludes that the logical, if indirect, effect of the application of Section 148B to delivery companies such as Xpressman results in modification of prices (due to higher costs), routes and services.  The Court notes, however, that not all First Circuit precedent points clearly in the direction of preemption.  The First Circuit in DiFiore implied that a state law regulating a company as an employer or the employment relationship between a company and its workers is not preempted.  In determining that Massachusetts's tips law, as applied to the fee charged by airlines for curbside baggage check by skycaps, was preempted by the Airline Deregulation Act, the Court observed that the statute "does more than simply regulate the employment relationship between the sky caps and the airline . . . ."[4]  646 F.3d at 87.  It concluded that "the tips law as applied here directly regulates how an airline service is performed and how its price is displayed to customers – not merely how the airline behaves as an employer or proprietor."  Id. at 88; see Tobin, 775 F.3d at 456 (noting that "[i]n DiFiore, we drew the preemption 'dividing line' between state laws that regulate 'how [a] service is performed' (preempted) and those that regulate how an airline behaves as an employer or proprietor (not preempted)").  Moreover, the DiFiore Court specifically rejected the defendant's argument that any state regulation is preempted where it imposes costs and thus affects prices.  Id. at 89.  Yet, at the same time, the Court cautioned that

---

[4] The relevant part of the Airline Deregulation Act's preemption provision is identical to the preemption provision in the FAAAA and thus the case law considering the former aids in the interpretation of the latter.  Dan's City, 133 S. Ct. at 1778.

the effect of a law on prices and services is not tenuous even if a defendant can comply with the law without incurring great expense.  Id. at 88.

DiFiore, however, also counseled that a statute that has a direct connection to prices and services "can fairly be said to regulate both."  646 F.3d at 87.  As such, the tips statute did "more than simply regulate the employment relationship between the skycaps and the airline."  Id. Even though the primary service of an airline is the flight itself and skycap services could be viewed as ancillary, the Court still concluded that the tips law was preempted.  In contrast, in the delivery context, how the delivery service is performed (by employees or independent contractors) is nearly identical to the delivery company's role as an employer.  The courier is both the face of the company and the ultimate provider of the core service offered by Xpressman. In regulating who may provide Xpressman's primary services, Section 148B has a direct connection to the services themselves and thus more than the mere employment relationship between Xpressman and its couriers is at issue here.

In summary, Section 148B logically has a significant effect on Xpressman's prices, routes and services and, therefore, Prong B of Section 148B is preempted by the FAAAA.  Such preemption is as a matter of law where, as discussed above, Prong B of Section 148B operates as a bar on the business model of same-day delivery service using independent contractors, such as Xpressman, where the service performed by the courier is not outside of the usual course of business of the employer.   Preemption is also as applied given the logical effect of Prong B of Section 148B on the routes, services and prices of a courier service like Xpressman, based upon the record in this case, as discussed above.

### C.  The extent of preemption

A court should "not nullify more of a legislature's work than is necessary."  <u>Ayotte v. Planned Parenthood of N. New England</u>, 546 U.S. 320, 329 (2006).  The relief requested by MDA is a declaration that the B Prong of Section 148B is preempted by the FAAAA, D. 177 at 13 & n. 17, and that is the extent of the Court's ruling today.[5]

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS MDA's motion for summary judgment, D. 156, and DENIES the Attorney General's cross-motion for summary judgment, D 82, 174.

**So Ordered.**

<u>/s/ Denise J. Casper</u>
United States District Judge

---

[5]Although the amended complaint sought both declaratory and injunctive relief, the Court understands from counsel's representation at oral argument that MDA was now seeking only declaratory relief, 3/4/15 transcript at 48, 62, and that is the extent of the relief granted in this Memorandum and Order.

United States Code Annotated
   Title 49. Transportation (Refs & Annos)
     Subtitle IV. Interstate Transportation (Refs & Annos)
      Part B. Motor Carriers, Water Carriers, Brokers, and Freight Forwarders (Refs & Annos)
       Chapter 145. Federal-State Relations

49 U.S.C.A. § 14501

§ 14501. Federal authority over intrastate transportation

Effective: August 10, 2005
Currentness

**(a) Motor carriers of passengers.--**

**(1) Limitation on State law.**--No State or political subdivision thereof and no interstate agency or other political agency of 2 or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to--

**(A)** scheduling of interstate or intrastate transportation (including discontinuance or reduction in the level of service) provided by a motor carrier of passengers subject to jurisdiction under subchapter I of chapter 135 of this title on an interstate route;

**(B)** the implementation of any change in the rates for such transportation or for any charter transportation except to the extent that notice, not in excess of 30 days, of changes in schedules may be required; or

**(C)** the authority to provide intrastate or interstate charter bus transportation.

This paragraph shall not apply to intrastate commuter bus operations, or to intrastate bus transportation of any nature in the State of Hawaii.

**(2) Matters not covered.**--Paragraph (1) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle, or the authority of a State to regulate carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.

**(b) Freight forwarders and brokers.--**

**(1) General rule.**--Subject to paragraph (2) of this subsection, no State or political subdivision thereof and no intrastate agency or other political agency of 2 or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to intrastate rates, intrastate routes, or intrastate services of any freight forwarder or broker.

**(2) Continuation of Hawaii's authority.**--Nothing in this subsection and the amendments made by the Surface Freight Forwarder Deregulation Act of 1986 shall be construed to affect the authority of the State of Hawaii to continue to regulate a motor carrier operating within the State of Hawaii.

**(c) Motor carriers of property.**--

**(1) General rule.**--Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

**(2) Matters not covered.**--Paragraph (1)--

**(A)** shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization;

**(B)** does not apply to the intrastate transportation of household goods; and

**(C)** does not apply to the authority of a State or a political subdivision of a State to enact or enforce a law, regulation, or other provision relating to the price of for-hire motor vehicle transportation by a tow truck, if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle.

**(3) State standard transportation practices.**--

**(A) Continuation.**--Paragraph (1) shall not affect any authority of a State, political subdivision of a State, or political authority of 2 or more States to enact or enforce a law, regulation, or other provision, with respect to the intrastate transportation of property by motor carriers, related to--

    **(i)** uniform cargo liability rules,

    **(ii)** uniform bills of lading or receipts for property being transported,

    **(iii)** uniform cargo credit rules,

    **(iv)** antitrust immunity for joint line rates or routes, classifications, mileage guides, and pooling, or

    **(v)** antitrust immunity for agent-van line operations (as set forth in section 13907),

if such law, regulation, or provision meets the requirements of subparagraph (B).

**(B) Requirements.**--A law, regulation, or provision of a State, political subdivision, or political authority meets the requirements of this subparagraph if--

(i) the law, regulation, or provision covers the same subject matter as, and compliance with such law, regulation, or provision is no more burdensome than compliance with, a provision of this part or a regulation issued by the Secretary or the Board under this part; and

(ii) the law, regulation, or provision only applies to a carrier upon request of such carrier.

**(C) Election.**--Notwithstanding any other provision of law, a carrier affiliated with a direct air carrier through common controlling ownership may elect to be subject to a law, regulation, or provision of a State, political subdivision, or political authority under this paragraph.

**(4) Nonapplicability to Hawaii.**--This subsection shall not apply with respect to the State of Hawaii.

**(5) Limitation on statutory construction.**--Nothing in this section shall be construed to prevent a State from requiring that, in the case of a motor vehicle to be towed from private property without the consent of the owner or operator of the vehicle, the person towing the vehicle have prior written authorization from the property owner or lessee (or an employee or agent thereof) or that such owner or lessee (or an employee or agent thereof) be present at the time the vehicle is towed from the property, or both.

**(d) Pre-arranged ground transportation.**--

**(1) In general.**--No State or political subdivision thereof and no interstate agency or other political agency of 2 or more States shall enact or enforce any law, rule, regulation, standard or other provision having the force and effect of law requiring a license or fee on account of the fact that a motor vehicle is providing pre-arranged ground transportation service if the motor carrier providing such service--

(A) meets all applicable registration requirements under chapter 139 for the interstate transportation of passengers;

(B) meets all applicable vehicle and intrastate passenger licensing requirements of the State or States in which the motor carrier is domiciled or registered to do business; and

(C) is providing such service pursuant to a contract for--

(i) transportation by the motor carrier from one State, including intermediate stops, to a destination in another State; or

**(ii)** transportation by the motor carrier from one State, including intermediate stops in another State, to a destination in the original State.

**(2) Intermediate stop defined.**--In this section, the term "intermediate stop", with respect to transportation by a motor carrier, means a pause in the transportation in order for one or more passengers to engage in personal or business activity, but only if the driver providing the transportation to such passenger or passengers does not, before resuming the transportation of such passenger (or at least 1 of such passengers), provide transportation to any other person not included among the passengers being transported when the pause began.

**(3) Matters not covered.**--Nothing in this subsection shall be construed--

**(A)** as subjecting taxicab service to regulation under chapter 135 or section 31138;

**(B)** as prohibiting or restricting an airport, train, or bus terminal operator from contracting to provide preferential access or facilities to one or more providers of pre-arranged ground transportation service; and

**(C)** as restricting the right of any State or political subdivision of a State to require, in a nondiscriminatory manner, that any individual operating a vehicle providing prearranged ground transportation service originating in the State or political subdivision have submitted to pre-licensing drug testing or a criminal background investigation of the records of the State in which the operator is domiciled, by the State or political subdivision by which the operator is licensed to provide such service, or by the motor carrier providing such service, as a condition of providing such service.

**CREDIT(S)**

    (Added Pub.L. 104-88, Title I, § 103, Dec. 29, 1995, 109 Stat. 899; amended Pub.L. 105-178, Title IV, § 4016, June 9, 1998, 112 Stat. 412; Pub.L. 105-277, Div. C, Title I, § 106, Oct. 21, 1998, 112 Stat. 2681-586; Pub.L. 107-298, § 2, Nov. 26, 2002, 116 Stat. 2342; Pub.L. 109-59, Title IV, §§ 4105(a), 4206(a), Aug. 10, 2005, 119 Stat. 1717, 1754.)

Notes of Decisions (99)

49 U.S.C.A. § 14501, 49 USCA § 14501

Current through P.L. 113-74 approved 1-16-14

---

**End of Document**                                                  © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XXI. Labor and Industries (Ch. 149-154)
Chapter 149. Labor and Industries (Refs & Annos)

M.G.L.A. 149 § 148B

§ 148B. Persons performing service not authorized under this chapter deemed employees; exception

Effective: July 19, 2004
Currentness

(a) For the purpose of this chapter and chapter 151, an individual performing any service, except as authorized under this chapter, shall be considered to be an employee under those chapters unless:--

(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

(2) the service is performed outside the usual course of the business of the employer; and,

(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

(b) The failure to withhold federal or state income taxes or to pay unemployment compensation contributions or workers compensation premiums with respect to an individual's wages shall not be considered in making a determination under this section.

(c) An individual's exercise of the option to secure workers' compensation insurance with a carrier as a sole proprietor or partnership pursuant to subsection (4) of section 1 of chapter 152 shall not be considered in making a determination under this section.

(d) Whoever fails to properly classify an individual as an employee according to this section and in so doing fails to comply, in any respect, with chapter 149, or section 1, 1A, 1B, 2B, 15 or 19 of chapter 151, or chapter 62B, shall be punished and shall be subject to all of the criminal and civil remedies, including debarment, as provided in section 27C of this chapter. Whoever fails to properly classify an individual as an employee according to this section and in so doing violates chapter 152 shall be punished as provided in section 14 of said chapter 152 and shall be subject to all of the civil remedies, including debarment, provided in section 27C of this chapter. Any entity and the president and treasurer of a corporation and any officer or agent having the management of the corporation or entity shall be liable for violations of this section.

(e) Nothing in this section shall limit the availability of other remedies at law or in equity.

**Credits**

Added by St.1990, c. 464. Amended by St.1992, c. 286, § 214; St.1993, c. 110, § 165; St.1998, c. 236, § 12; St.2004, c. 193, § 26, eff. July 19, 2004.

Notes of Decisions (21)

M.G.L.A. 149 § 148B, MA ST 149 § 148B

Current through Chapter 43 of the 2014 2nd Annual Session

---

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.   A-025

H.R. CONF. REP. 103-677, H.R. Conf. Rep. No. 677, 103RD Cong.,
2ND Sess. 1994, 1994 U.S.C.C.A.N. 1715, 1994 WL 440339 (Leg.Hist.)
**\*1** P.L. 103–305, FEDERAL AVIATION ADMINISTRATION AUTHORIZATION ACT OF 1994

DATES OF CONSIDERATION AND PASSAGE

House: October 7, 13, 1993; August 8, 1994
Senate: June 9, 10, 14, 15, 16, August 8, 1994
Cong. Record Vol. 139 (1993)
Cong. Record Vol. 140 (1994)
House Report (Public Works and Transportation Committee) No. 103–240,
Sept. 14, 1993 (To accompany H.R. 2739)
Senate Report (Commerce, Science and Transportation Committee) No. 103–181,
Nov. 12, 1993 (To accompany S. 1491)
House Conference Report No. 103–677,
Aug. 5, 1994 (To accompany H.R. 2739)

HOUSE CONFERENCE REPORT NO. 103−677

August 5, 1994
[To accompany H.R. 2739]

**\*\*0**  The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 2739) to amend the Airport and Airway Improvement Act of 1982 to authorize appropriations for fiscal years 1994, 1995, and 1996, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the Senate amendment, insert the following:

SECTION 1. SHORT TITLE; TABLE OF CONTENTS.

(a) Short Title.–This Act may be cited as the "Federal Aviation Administration Authorization Act of 1994".

(b) TABLE OF CONTENTS.–

Sec. 1. Short title; table of contents.

Sec. 2. Definitions.

Sec. 3. Amendment of title 49, United States Code.

**TITLE I–AIRPORT AND AIRWAY IMPROVEMENT**

Sec. 101. Airport improvement program.

Pages 2-82 omitted; discussion of

"SECTION 601–Preemption of Intrastate Transportation of Property"

begins on Page 83.

Amounts in the Trust Fund are available (as provided by Appropriations Acts) for making expenditures before October 1, 1995.

House bill

The House bill extends the Trust Fund expenditure authority through September 30, 1996, and allows expenditures from the Trust Fund for obligations incurred under the House bill's airport and airway authorizing Act.

**\*82 \*\*1754** Senate amendment

The Senate amendment allows expenditures from the Trust Fund for obligations incurred under the Senate amendment's airport and airway authorizing Act.

Conference agreement

The conference agreement extends the Trust Fund expenditure authority through September 30, 1996, and allows expenditures from the Trust Fund for obligations incurred under the conference agreement's airport and airway authorizing Act. The conference agreement also makes technical, conforming changes to reflect the codification of the airport and airway Acts referred to in section 9502(d) of the Internal Revenue Code.

SECTION 601–Preemption of Intrastate Transportation of Property

House bill

No provision.

Senate amendment

The Senate provision preempted State and local law regarding trucking rates, routes and services of "intermodal all-cargo air carriers". Intermodal all-cargo air carriers included: air carriers, indirect air cargo air carriers, motor carriers that are affiliated with an air carrier through common controlling ownership and motor carriers which, as principal or agent, utilize or are affiliated through common controlling ownership with, companies that utilize air carriers at least 15,000 times annually.

Conference substitute

The provision preempts State regulation of prices, routes and services by air carriers and carriers affiliated with a direct air carrier through common controlling ownership in subsection (b) and all other motor carriers in subsection (c). The purpose of this demarkation is (1) to as completely as possible level the playing field between air carriers on the one hand and motor carriers on the other with respect to intrastate economic trucking regulation, and (2) to recognize that air carrier express package delivery companies may differ in corporate form, but operate in the same manner. Thus, this provision includes carriers affiliated with a direct air carrier through common controlling ownership in a new paragraph added to Section 41713(b) of Title 49, United States Code, the former section 105 of the Federal Aviation Act. Motor carriers are deregulated with a new subsection (h) added to section 11501 of Title 49 (the Interstate Commerce Act).

Subsection (a) enumerates Congress' findings and purposes in enacting Section 601.

Subsection (b) preempts State regulation of air carriers and carriers affiliated with direct air carriers through common controlling ownership by the addition of a new paragraph (4)(A) to Section 41713(b) of Title 49, United States Code, which is the recodified former Section 105(a) of the Federal Aviation Act. Paragraph (4)(A) preempts State regulation for this entire class of carriers in an **83** **1755** identical manner to the preemption provision passed in 1978 contained in the former Section 105.

The central purpose of this legislation is to extend to all affected carriers, air carriers and carriers affiliated with direct air carriers through common controlling ownership on the one hand and motor carriers on the other, the identical intrastate preemption of prices, routes and services as that originally contained in Section 105(a), 49 U.S.C. App. 1305(a)(1), of the Federal Aviation Act.

However, Congress has recently enacted a recodification of certain subtitles of Title 49. This recodification has changed the language used in the original section 105. For clarity and consistency, we will follow the recodification language in amendments to both the Interstate Commerce Act and Federal Aviation Act. In substituting the word "related" for the prior word "relating" and the word "price" for the word "rates" we are intending no substantive change to the previously enacted preemption provision in Section 105 of the Federal Aviation Act and do not intend to impair the applicability of prior judicial case law interpreting these provisions. In particular, the conferees do not intend to alter the broad preemption interpretation adopted by the United States Supreme Court in Morales v. TransWorld Airlines, Inc., 504 U.S. , 199 L.Ed. 157, 112 S.Ct 2031 (1992).

The conferees understand that in recodifying Title 49, Congress made no substantive change to the Statute. Section 1(a) of P.L. 103–272 states "[c]ertain general and permanent laws *** are revised, recodified and enacted *** without substantive change ***" Furthermore, page 5 of the Report accompanying P.L. 103–272 states the following:

"As in other codification bills enacting titles of the United States Code into positive law, this bill makes no substantive change in the law. It is sometimes feared that mere changes in terminology and style will result in changes in substance or impair the precedent value of earlier judicial decisions and other interpretations. This fear might have some weight if this were the usual kind of amendatory legislation when it can be inferred that a change of language is intended to change substance. In a codification law, however, the courts uphold the contrary presumption: the law is intended to remain substantively unchanged." The following authorities affirm this principle: (For a complete list of citations, see Report to Accompany H.R. 1758, P.L. 103–272 [Report number 103–180] at 5.)

Thus, the Conferees have used the term "price, route and service" rather than "rate, route and service" in both the Aviation subtitle and the Motor Carrier subtitle. The intention in using the identical term "price" in both areas is to create uniformity in the preemptive language and to create consistency with the earlier preemption provision. The use of this term is not intended to alter any meaning or affect any judicial interpretation.

To ensure that no meaning is altered or changed by the recodification, the definition of "price" in subtitle VII that was created as part of the recodification of Title 49 has been amended to strike that definition's reference to air transportation. The conferees believe that the recodification's creation of a definition of "price" created a circumstance which would have defined the word in a man4>>nermanner inconsistent with its intended use and meaning in this section and therefore have made this conforming change. In doing so, the conferees intend no substantive change to existing law, just as the recodification itself is deemed to have made no substantive change in existing law. The substantive meaning and the continuity of case law continue uninterrupted and unaltered from the old section 105 of the Federal Aviation Act, through the recodified version, to the modifications made by this section.

Paragraph (4)(B) emphasizes that State authority to regulate safety, financial responsibility relating to insurance, transportation of household goods, vehicle size and weight and hazardous materials routing of air carriers and carriers affiliated with a direct air carrier through common controlling ownership is unchanged, since State regulation in those areas is not a price, route or service and thus is unaffected. (This provision is identical to the new subsection 11501(h)(2)(A) discussed below.)

This list is not intended to be all inclusive, but merely to specify some of the matters which are not "prices, rates or services" and which are therefore not preempted.

The conferees do not intend the regulatory authority which the States may continue to exercise (partially identified in section 41713(b) and under section 11501(h)) to be used as a guise for continued economic regulation as it relates to prices, routes or services. There has been concern raised that States, which by this provision are prohibited from regulating intrastate prices, routes and services, may instead attempt to regulate intrastate trucking markets through its unaffected authority to regulate matters such as safety, vehicle size and weight, insurance and self-insurance requirements, or hazardous materials routing matters. The conferees do not intend for States to attempt to de facto regulate prices, routes or services of intrastate trucking through the guise of some form of unaffected regulatory authority.

There has been further concern raised that new sections 41713(b)(4)(B) and 11501(h)(2)(A) may be construed as granting States additional authority to regulate in those enumerated areas rather than simply stressing that the preemption provisions do not apply to those areas. The conferees emphasize that nothing in these new subsections contains a new grant of Federal authority to a State to regulate commerce and nothing in these sections amends other Federal statutes that govern the ability of States to impose safety requirements, hazardous materials routing matters, truck size and weight restrictions or financial responsibility requirements relating to insurance or any other unenumerated authority not preempted by these sections.

For example, if a State exercises authority over the routing of hazardous materials shipments by motor carriers, it must exercise that authority consistent with Federal standards issued on routing pursuant to Federal law governing transportation of hazardous materials (49 U.S.C. Sections 5101–5127). The intention of the conferees is solely to identify certain areas that are not preempted by the preemption provision.

New paragraph (4)(C) of Section 41713(b) states that the preemption provision added to Section 41713(b) does not modify any earlier provisions of the current Section 41713(b) or the former Sec5>>tionSection 105 of the Federal Aviation Act, including that applicable to the State of Alaska.

Subsection (c) of Section 601 preempts State regulation of prices, routes and services of motor carriers by adding a new subsection (h) to section 11501 of Title 49, United States Code.The preemption provision, new subsection (h)(1), is identical to the preemption provision deregulating air carriers and carriers affiliated with a direct air carrier through common controlling ownership and is intended to function in the exact same manner with respect to its preemptive effects. The intention is to create a completely level playing field between air carriers and carriers affiliated with a direct air carrier through common controlling ownership on the one hand and motor carriers on the other.

New subsection (h)(1) contains a parenthetical limitation which states that this section applies to motor carriers other than those carriers affiliated with a direct air carrier through common controlling ownership. This parenthetical is merely intended to ensure that no carrier affiliated with a direct air carrier through common controlling ownership would be covered by both preemption provisions.

Furthermore, neither preemption provision would preempt the ability of a State to issue a certificate or other documentation (in written or electronic form) demonstrating that the carrier complies with State requirements which are not preempted by these sections and nothing in this amendment is intended to change the application of State tax laws to motor carriers.

The conferees further clarify that the motor carrier preemption provision does not preempt State regulation of garbage and refuse collectors. The managers have been informed by the Department of Transportation that under ICC case law, garbage and refuse are not considered "property". Thus garbage collectors are not considered "motor carriers of property" and are thus unaffected by this provision.

The term motor carrier as used in new subsection (h) of section 11501 has a broad connotation. The term covers the transportation of property by motor carriers of passengers. Thus, when a motor carrier of passengers is transporting property in intrastate commerce, there is no jurisdiction by the State regulatory body over price, route or service for any of the property being transported. The latter is true even if the property is being transported in the same vehicle that moves passengers.

The term motor carrier covers contract carriers and common carriers of property. Also included in the term is a motor carrier that handles express shipments. The law also applies to private motor carriers, that is, carriers that are pursuing their own business interests or interests of any corporate affiliate.

New subsection (h)(2) emphasizes that State authority to regulate safety, financial fitness and insurance, transportation of household goods, vehicle size and weight and hazardous materials routing of motor carriers is unchanged since State regulation in those areas is not a price, route or service and thus is unaffected. This subsection is identical to section 41713(b)(4)(B), described above.

New subsection (h)(3) permits continued State regulation over four enumerated standard transportation practices in an optional **86  **1758 manner. This section does not confer any new authority to a State, but merely confirms that these four areas are not preempted. These four areas are uniform cargo liability rules, uniform bills of lading or receipts, uniform cargo credit rules and antitrust immunity for interlining, classifications and mileage guides. This permitted State regulatory authority is limited in two respects. First, a State may only regulate in these four areas in a manner that is no more burdensome than a Federal regulation on the same subject matter. Second, none of these regulations shall apply to any carrier that does not wish to be subject to such regulations.

The purpose of new subsection (h)(3) is to permit carriers that want to follow State standard transportation practices to be subject to State-wide regulatory schemes in these four areas only. Any carrier which so chooses does not have to elect to be subject to such regulation.

New subsection (h)(3) also contains a provision that permits carriers affiliated with a direct air carrier through common controlling ownership, which by the explicit terms of new subsection (h)(1) are not subject to the terms of that provision, to elect to be subject to State regulation in any of the four areas enumerated in new subsection (h)(3). This sentence was included to allow a carrier affiliated with a direct air carrier through common controlling ownership to be subject to State regulation in these four areas if it so chose.

Subsection (d) provides that all subsections of Section 601 will take effect on January 1, 1995, except that any regulation of motor carriers operating in the State of Hawaii preempted by subsection (c) of Section 601 shall not be affected for three years from the date of enactment. The conferees directed the difference in the effective date for the State of Hawaii at the request of the State. The State had requested the conferees to totally except Hawaii from the preemption provision based on Hawaii's unique geographic circumstance, as the only State that is non-contiguous to the mainland since the State is totally surrounded by water. Therefore, all regulation of motor carrier transportation in the State of Hawaii is regulated by the State of Hawaii. Though the conferees were not willing to except Hawaii from the preemption provisions, they were convinced that due to these special circumstances the State should have additional time before preemption goes into effect.

Background and statement of purpose

Currently, 41 jurisdictions regulate, in varying degrees, intrastate prices, routes and services of motor carriers. The jurisdictions which do not regulate are: Alaska, Arizona, Delaware, District of Columbia, Florida, Maine, Maryland, New Jersey, Vermont and Wisconsin.

Typical forms of regulation include entry controls, tariff filing and price regulation, and types of commodities carried. Not all 41 States regulate each of these aspects nor do they all regulate them in the same manner or to the same degree.

Entry controls at the State level vary from liberal to strict. Strict entry controls often serve to protect carriers, while restricting new applicants from directly competing for any given route and type of trucking business. About 26 States strictly regulate truck 87>>ingtrucking prices. Such regulation is usually designed to ensure not that prices are kept low, but that they are kept high enough to cover all costs and are not so low as to be "predatory". Price regulation also involves filing of tariffs and long intervals for approval to change prices. A company which wants to change its prices often must go through a costly and lengthy hearing proceeding in each State in which it operates.

The need for section 601 has arisen from this patchwork of regulation and in a June 25, 1991 9th Circuit Court of Appeals decision (Federal Express Corporation v. California Public Utilities Commission, 936 F.2d 1075 (9th Cir., 1991), cert. denied, 112 S.Ct. 2956 (1992)) in which Federal Express challenged California's authority to regulate the company's motor carrier operations. The court found that intrastate economic regulations for motor carriers did not apply to Federal Express because it was preempted by the Airline Deregulation Act of 1978, by virtue of the fact that it is an air carrier. Although several of its competitors conduct similar operations, they are not organized as air carriers. For example, United Parcel Service remained regulated, because it is organized as a "motor carrier", putting it at a competitive disadvantage in a number of States.

In light of the inequity created by the 9th Circuit Court Decision, California enacted legislation in October of 1993, which extended the exemption enjoyed by Federal Express as a result of its court victory to its competitors that are motor carriers affiliated with direct air carriers. The California legislation denied this exemption, however, to those using a large proportion of owner-operators instead of company employees, thereby denying the exemption to Roadway Package System, even though the Roadway holding company includes an air operation. Likewise, the Texas Attorney General has applied the 9th Circuit decision to Texas and broadened it to include other intermodal air ground carriers with similar operations. The Texas Railroad Commission has accepted the Attorney General decision. However, competitors whose operations are not integrated are still regulated. Likewise, Kentucky enacted legislation in May 1994 exempting from its regulation the carriage of packages weighing less than 150 pounds, by motor carriers affiliated with either direct or indirect air carriers.

Despite the movement toward deregulation by some individual states, the conferees believe preemption legislation is in the public interest as well as necessary to facilitate interstate commerce. State economic regulation of motor carrier operations causes significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology and curtails the expansion of markets. According to Department of Transportation estimates, preemption of State economic regulation could eventually yield $3–8 billion per year in savings. Other estimates put the savings as high as $5–12 billion. The sheer diversity of these regulatory schemes is a huge problem for national and regional carriers attempting to conduct a standard way of doing business. In hearings held on this issue, numerous examples have been cited in which rates for shipments within a state exceed rates for comparable distances across state lines. In the small package express business, companies frequently ship goods across state lines and back into **88 **1760 the state of origin to avoid the higher rates for purely intrastate shipments. Lifting of these antiquated controls will permit our transportation companies to freely compete more efficiently and provide quality service to their customers. Service options will be dictated by the marketplace; and not by an artificial regulatory structure.

The provision is supported by the Clinton Administration. Its statement of administration policy during floor consideration of S. 1491 reads: "The Administration particularly supports the Amendment's provision which addresses the problem of inconsistent regulation of intermodal all-cargo air carriers. Enactment of this provision would be an important step in resolving conflicting laws that interfere with efficient intermodal cargo movements."

After years of official policy against intrastate motor carrier deregulation, the American Trucking Associations issued a position on June 24, 1994 which stated that "ATA will no longer oppose Federal preemption of state regulation of motor carrier rates and entry based on economic factors," with some conditions that would allow regulatory protection to continue for non-economic factors, such as liability rules, antitrust immunity to publish documents, insurance, safety, leasing and cargo credit rules. The conferees have attempted to address these conditions in Section 11501 of title 49 as amended by this provision.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works. 87

It is important to note that the Senate provision created some ambiguity as to which carriers would be able to avail themselves of the preemption. In the version agreed to by the conferees, it is clear that all air carriers and carriers affiliated with a direct air carrier through common controlling ownership, motor carriers and motor private carriers involved in the transportation of property are covered by the preemption. The conferees believed it was patently unfair to create a level playing field for most of the industry, while leaving an unfortunate few still bound by economic regulatory controls.

The conferees are well aware that in recent years there has been considerable litigation with respect to the status of certain carriers, specifically as to whether they are air carriers or are motor carriers, and whether they are covered by the Railway Labor Act or the National Labor Relations Act. The purpose of this section is to preempt economic regulation by the States, not to alter, determine or affect in any way whether any carrier is or should be considered either an air carrier or a motor carrier for any purpose other than this section, whether any carrier is or should be covered by one labor statute or another, or the status of any collective bargaining agreement.

During the hearing on preemption of State regulation held by the House Committee on Public Works and Transportation on July 20, 1994, concerns were raised regarding the devaluation of operating rights and its effect on motor carriers, as a result of preemption of State authority to regulate the price, route, or service for intrastate transportation. Some motor carriers have purchased or paid to acquire the authority to operate trucks in many States. These operating rights for many motor carriers, especially small carriers, are an important part of their net business assets. The conferees **\*89  \*\*1761** recognize that this will eliminate the asset value of the operating authority of those affected motor carriers.

From the Committee on Public Works and Transportation, for consideration of titles I and II of the House bill, and the Senate amendment (except secs. 121, 206, 304, 415, 418 and title VI), and modifications committed to conference:

> Norman Y. Mineta,
> Nick Rahall,
> James L. Oberstar,
> Robert A. Borski,
> Bob Clement,
> Bud Shuster,
> Bill Clinger,
> Thomas E. Petri,

From the Committee on Banking, Finance and Urban Affairs, for consideration of title VI of the Senate amendment, and modifications committed to conference:

> Henry Gonzalez,
> Steve Neal,

From the Committee on Education and Labor, for consideration of sec. 418 of the Senate amendment, and modifications committed to conference:

> William D. Ford,
> Major R. Owens,
> Howard "Buck" McKeon,

From the Committee on Education and Labor, for consideration of sec. 208 of the House bill, and modifications committed to conference:

> William D. Ford,
> Bill Clay,
> Pat Williams,

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

From the Committee on Foreign Affairs, for consideration of sec. 415 of the Senate amendment, and modifications committed to conference:

> Lee H. Hamilton,
> Tom Lantos,
> Gary L. Ackerman,
> Howard L. Berman,
> Eni Faleomavaega,
> Benjamin A. Gilman,
> Bill Goodling,
> Jim Leach,

From the Committee on Science, Space, and Technology, for consideration of title III of the House bill, and secs. 206 and 304 of the Senate amendment, and modifications committed to conference:

> George E. Brown, Jr.,
> Tim Valentine,
> Dan Glickman,
> Pete Geren,
> Jane Harman,
> Robert S. Walker,
> Tom Lewis,
> Constance Morella,

**\*90   \*\*1762**  From the Committee on Ways and Means, for consideration of title IV of the House bill, and secs. 121 and 122 of the Senate amendment, and modifications committed to conference:

> Sam Gibbons,
> Dan Rostenkowski,
> J. J. Pickle,
> Pete Stark,
> Bill Archer,
> Phil Crane,
> Managers on the Part of the House.
> Ernest Hollings,
> Wendell Ford,
> James Exon,
> John C. Danforth,
> Larry Pressler,
> Managers on the Part of the Senate.

H.R. CONF. REP. 103-677, H.R. Conf. Rep. No. 677, 103RD Cong., 2ND Sess. 1994, 1994 U.S.C.C.A.N. 1715, 1994 WL 440339 (Leg.Hist.)

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

A-034